MELIA v. EMPLOYMENT SECURITY COMMISSION.

1. STATUTES—CONSTRUCTION—COURTS.
   It is the duty of a court to interpret a statute as found, the wisdom of the provision in question in the form enacted being a matter of legislative responsibility, since a court may not legislate.

2. SAME—CONSTRUCTION—INTENT.
   The cardinal rule of statutory construction is to ascertain and give effect to the intention of the legislature and the intent of an unambiguous statute must be determined accordingly.

3. SAME—CONSTRUCTION—ALL PERTINENT PARTS CONSIDERED TO-GETHER.
   It is requisite that the pertinent provisions of an act be considered together, to the end that the general plan and purpose of the law-making body may be ascertained.

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 13]  50 Am Jur, Statutes § 228.
[2]  50 Am Jur, Statutes § 223.
[3]  50 Am Jur, Statutes § 306.
[4–6]  50 Am Jur, Statutes §§ 357, 358.
[7]  50 Am Jur, Statutes § 325 et seq.
[8]  50 Am Jur, Statutes § 319.
[10]  50 Am Jur, Statutes § 238.

4. SAME—CONSTRUCTION—NO CLAUSE TO BE IGNORED.

All parts of a specific provision of a statute to be construed must be given force and effect and no clause or word may be ignored in determining the construction of such provision.

5. SAME—CONSTRUCTION—ONE PART NOT TO RENDER ANOTHER PART NUGATORY.

Effect must be given to every part of a statute being construed and one part not so construed as to render another part nugatory or of no effect.

6. SAME—CONSTRUCTION—PRESUMPTION AS TO MEANING.

Every clause and every word in a statute under construction is presumed to have some force and meaning.

7. SAME—EXECUTIVE INTERPRETATION.

The executive interpretation given a law by officials charged with its administration must be presumed to have been known to the legislature so that such construction would be carried with it and sanctioned when the legislature amends the statute and re-enacts the language so construed.

8. SAME—CONSTRUCTION BY DEPARTMENT OF GOVERNMENT.

The construction placed upon statutory provisions by any particular department of government for a long period of time, although not binding upon the courts, should be given considerable weight.

9. UNEMPLOYMENT COMPENSATION—CONSTRUCTION OF STATUTES—MAXIMUM BENEFITS.

Neither the section of the employment security act relating to the payment of benefits from the fund created under the direction of the legislature nor the section dealing with the matter of credit weeks with reference to which the rate of payment in each instance is to be determined enter directly into the determination of the interpretation of recently amended section designed to increase the maximum amount of benefits payable to persons who came within provisions of such amended section (PA 1936 [Ex Sess]), No 1, §§ 27, 50, 60[a], as amended by PA 1954, No 197).

10. SAME—CONSTRUCTION OF STATUTES—WORDS AND PHRASES—EXHAUSTED.

The term "exhausted," as used in amended section of the employment security act relative to increase of maximum amount of benefits payable to individuals whose "benefit rights were not exhausted prior to" a stated date, is not ambiguous and must be construed in accordance with com-

mon and approved usage (CLS 1952, § 8.3; CLS 1954, § 421.60 [a]).

11. WORDS AND PHRASES—EXHAUSTED.

The term "exhausted" means consumed, used up, spent.

12. UNEMPLOYMENT COMPENSATION—EXHAUSTION OF BENEFIT RIGHTS.

Employee whose benefit rights were exhausted prior to date set by the legislature in statute increasing the maximum benefits payable was not entitled to the increase of benefits accorded to those whose benefit rights were not exhausted before such date (CLS 1954, § 421.60[a]).

13. STATUTES—CONSTRUCTION.

The Supreme Court is without authority to construe an amendment to a statute other than in accordance with its specific provisions.

14. UNEMPLOYMENT COMPENSATION—CONSTRUCTION OF STATUTES— EXHAUSTION OF BENEFITS.

Contention that employee whose benefits under the employment security act were exhausted by payment made on May 14, 1954, was entitled to increase of benefits accorded by amendatory act effective May 7, 1954, *held*, without merit, where to do so would render nugatory a provision of the amended section granting an increase on portion of "benefit rights which were not exhausted prior to June 27, 1954" (CLS 1954, § 421.60[a]).

15. COSTS—CERTIORARI—CONSTRUCTION OF STATUTES.

No costs are allowed in certiorari proceeding involving a question of statutory interpretation.

SMITH and BLACK, JJ., dissenting.

Appeal from Wayne; Smith (Raymond L.), J., presiding. Submitted April 12, 1956. (Docket No. 39, Calendar No. 46,705.) Decided September 4, 1956.

Certiorari by Mary E. Melia against Michigan Employment Security Commission and its Appeal Board to review denial of further payments claimed under amendment to employment security act. Order granting additional benefits. Universal Products Company, Inc., a Delaware corporation, inter-

venes and, following denial of rehearing, appeals. Reversed.

*Zwerdling, Zwerdling, Keith & Livingston* (*A. L. Zwerdling,* of counsel), for plaintiff.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Arthur W. Brown,* Assistant Attorney General, for defendant commission.

*McClintock, Fulton, Donovan & Waterman,* for intervening defendant Universal Products Company.

*Amici Curiae:*

*Beaumont, Smith & Harris* and *Frank E. Cooper,* for Michigan Employers' Unemployment Compensation Bureau, Inc., and the Budd Company.

Smith, J. (*dissenting*). We must here determine the meaning of an amendment[*] to the Michigan employment security act.[†] The plaintiff, Mary E. Melia, sought and obtained an adjustment in her unemployment compensation by virtue of such amendment. Appealing the order of the circuit court is her employer, Universal Products Company, Inc., a Delaware corporation. Joining as *amici curiae* are the Michigan Employers' Unemployment Compensation Bureau, Inc., and the Budd Company. Also before us is the Michigan employment security commission, as interested party which, with the appeal board of such commission, was a defendant below. The commission asserts that, "though nominally an

---

[*] PA 1954, No 197 (CLS 1954, § 421.1 *et seq.*).
[†] PA 1936 (Ex Sess), No 1, as amended by PA 1951, No 251 (CL 1948 and CLS 1952, § 421.1 *et seq.* [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 *et seq.*]).

appellee herein, [it] agrees with the appellant, Universal Products Company, Inc., in its contention that the plaintiff and appellee, Mary Melia, is not legally entitled to the payment of the additional benefits provided in sections 27 and 50 of PA 1954, No 197, during her current and unexpired benefit year."

There is no dispute as to the facts. Mrs. Melia had worked for Universal Products Company for about a year when she was laid off for lack of work. She filed her claim for unemployment compensation benefits on October 2, 1953, and it was determined that she was entitled to $27 per week for 20 weeks, and that she had a current and unexpired benefit year beginning September 27, 1953 and ending September 25, 1954. Her 20th check for such sum was received by her on May 14, 1954, at which time she also received Form UC 530, entitled "Notice to Claimant of Exhaustion of Benefits."

On May 7, 1954, the governor signed PA 1954, No 197, which was ordered to take immediate effect. Section 60(a) thereof (the transition section), which has provoked this controversy, provides as follows:

"If this amendatory act takes effect before May 15, 1954, then each individual for whom there is current an unexpired benefit year established prior to June 27, 1954, shall receive an adjustment reflecting any increase in his weekly benefit rate and/or maximum amount of benefits which will result from applying sections 27 and 50 of this act, as amended, on that portion of his benefit rights which were not exhausted prior to June 27, 1954; and in the case of benefit years established on or after June 27, 1954, the weekly benefit rate and maximum amount of benefits shall be computed in accordance with sections 27 and 50 of this act, as amended. If this amendatory act does not take effect before May 15, 1954, then the provisions of sections 27 and 50 of this act, as amended, relating to the weekly benefit rate and maximum amount of benefits, shall be ap-

plicable only to benefit years established after the effective date of this amendatory act."

Subsequent thereto, and on several occasions, Mrs. Melia applied for "the extended 6 weeks" (of benefits), basing her claim upon "the new law." During this time she was looking for work, and wanted to work "but they wouldn't even hire men. They laugh at you and you go looking for work, especially woman." On July 19th the commission issued its notice of determination, denying her claim in the following terms:

"Your claim for benefits for weeks ending July 3 and July 10, 1954, is denied under the provisions of section 60(a) of the Michigan employment security act. Your benefits for the benefit year ending September 24, 1954, were exhausted by the payment made on May 14, 1954 for week ending May 8, 1954, which was prior to June 27, 1954, the date the amendments to sections 27 and 50 of the act became effective."

A notice of redetermination was issued on July 26th, affirming the original determination of denial, following which a referee's ruling also denied Mrs. Melia's claim. This ruling was affirmed by a majority of the appeal board. Appellee's petition for writ of certiorari to the circuit court for Wayne county resulted in a reversal by the circuit court of the appeal board and the case comes to us as a general appeal upon leave granted. (It is unnecessary to this determination to trace appellant's steps of intervention, concerning which no question is raised.)

The positions of appellant, the *amici curiae,* and the nominal appellee Michigan employment security commission, are variously stated but they all reduce to 1 basic assertion, namely, that (in the words of Universal Products Company, Inc., appellant):

"Appellee exhausted on May 14, 1954, her benefit rights under the act prior to its amendments * * * and, therefore, was not entitled to receive the adjustment in benefit rights provided for by the amended act."

Or, as put by *amici curiae,* "an individual's benefit rights (are) exhausted after he draws the maximum amount of benefits to which he is then entitled under the law."

This exhaustion, it is said, came on May 14, 1954, since on that date "she was paid by the Michigan employment security commission, and she thereafter cashed, her twentieth unemployment compensation benefit check, thereby exhausting the benefits to which she was entitled under the old law during the benefit year ending September 25, 1954." Thus it is urged in substance that the act equates money payments to benefit rights and the exhaustion of the one parallels the exhaustion of the other. Claimant's position, on the other hand, is that rights under the act must not be confused with (or equated to) money payments made to those, and only those, having a right thereto.

It is a truism that we seek the legislative intent, *General Motors Corporation* v. *Unemployment Compensation Commission,* 321 Mich 724. In such search courts have been guided since ancient times by a consideration of the "mischief and defect"* sought

---

* "In *Heydon's Case* in 1584 [3 Co Rep 7a, 76 Eng Rep 637], after all the barons of the exchequer had argued in open court, it was unanimously resolved by Sir Roger Manwood, chief baron, and the other barons of the exchequer:

"'That for the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law,) 4 things are to be discerned and considered. 1. What was the common law before the making of the act? 2. What was the mischief and defect for which the common law did not provide? 3. What remedy the parliament hath resolved and appointed to cure the disease of the commonwealth? And 4. The true reason of the remedy? And then the office of all the judges is always to make such construction as shall suppress the mischief, and ad-

to. be attacked by the legislature in the act under examination.  We do not lack for enlightenment with respect thereto.  The statutory scheme here involved is not peculiar to this jurisdiction.  It had its birth in the great depression of the late twenties and early thirties under circumstances described by Mr. Justice Cardozo in the following words:

"During the years 1929 to 1936, when the country was passing through a cyclical depression, the number of the unemployed mounted to unprecedented heights.  Often the average was more than 10 million; at times a peak was attained of 16 million or more. Disaster to the breadwinner meant disaster to dependents.  Accordingly the roll of the unemployed, itself formidable enough, was only a partial roll of the destitute or needy.  The fact developed quickly that the States were unable to give the requisite relief.  The problem had become national in area and dimensions.  There was need of help from the nation if the people were not to starve."  *Steward Machine Co.* v. *Davis*, 301 US 548, 586 (57 S Ct 883, 81 L ed 1279, 109 ALR 1293).

Michigan's policy with respect to the evil, and the threat imposed thereby was, and is, clear, and clearly stated:

"Sec. 2.  Declaration of policy.  The legislature acting in the exercise of the police power of the State declares that the public policy of the State is as follows:  Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State.  Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often

vance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief, and *pro privato commodo,* and to add force and life to the cure and remedy, according to the true intent of the makers of the act, *pro bono publico.'*"  Hutcheson, A Case for Three Judges, 47 Harv LR 795, 798; Newman & Surrey's Legislation, p 665.

falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this State. Social security requires protection against this hazard of our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this State." CL 1948, § 421.2 (Stat Ann 1950 Rev § 17.502).

So it is that we find introduced into our law a new concept of social obligation, an extension of the police power of the State, because of sheer necessity, into a field unknown to the common law. No longer are the bulk of our industrial people close to the soil to which they may turn for succor when the mill closes. They must turn to their meager savings, and then to charity, the free basket, swallowing pride and self-respect along with the handout. Life 'at such a price is dearly bought. It was necessary both from social and economic points of view that means be found to lighten "(the) burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this State." The provisions of the act which we are here to construe were the means found. It was the implementation of the declared policy of our people that we (1936), and other States, accepted "the provisions of the act of congress entitled 'An act to provide for the establishment of a national employment system and for cooperation with the States in the promotion of such system, and for other purposes,' approved June 6,

1933, as amended, hereinafter referred to as the Wagner-Peyser act." (CL 1948, § 421.12 [Stat Ann 1950 Rev § 17.512].)

We have held, accordingly, that the statute "was enacted in the interest of public welfare to provide for assistance to the unemployed and as such is entitled to a liberal interpretation." *Godsol* v. *Unemployment Compensation Commission,* 302 Mich 652, 665 (142 ALR 910). In the light of this canon of interpretation, and the expressed policy of the act, the case of *Cutting* v. *Atlas Mutual Insurance Co.,* 199 Mass 380 (85 NE 174), involving a private contractual relationship under an insurance policy, and the exhaustion of benefit rights thereunder, furnishes no apt analogy.

So much for the basic statute, its origins and its purposes. But economic conditions do not remain. static. Aid adequate for one day may not serve the next, as this record makes us so keenly aware. The period from June of 1953 to June of 1954 was, within our State, a period of mounting economic distress. From June to June there was a rise in unemployment from 45,000 to 214,000. The Detroit area alone saw an increase from 21,000 to 135,000 unemployed. Exhaustion of unemployment insurance claims ("when the claimant draws the last check, which he is entitled to, in the benefit year, we call it an exhausted claim") had risen from approximately 12,-000 in the first 6 months of 1953 to 57,000 in the first 6 months of 1954. The governor's message of January 14, 1954, depicted the situation in the words: "One out of 20 Michigan wage earners is out of work. Rising unemployment in the automobile plants is causing deep concern. Numerous Michigan workers are employed at substandard wages. Business men are fearful of falling off of purchasing power." The governor thereupon recommended that unemploy-insurance benefits be increased. "One phase of this

question," he said (and that is one now before this Court) "has ceased to be controversial. That is the need for extension of the period of benefits from 20 to 26 weeks. Again I recommend that this be included in a prompt and fair revision of the act." It is the amendment of the act passed pursuant thereto that we are called upon to consider.

The scheme of the statute must be described briefly in order that the term benefit rights, which we are here construing, may acquire meaning in context. The statutory procedure commences with the filing of a claim for compensation. Generally speaking, a claimant's earnings during the base period (section 45) govern the amount of payments made (section 27) during the benefit year (section 46). The term "benefit year" is a term of art in the act. The act provides, in part, with respect thereto, that "no benefit year may be established unless the individual meets all of the following conditions." At this point follow the statutory requirements as to wages earned (of a specified amount for a specified duration), the meeting of "all other requirements of section 28" (pertaining to registration, reporting, being able and available to work, having served a waiting period, et cetera), and the proviso that the individual not be disqualified under section 29 (because of intoxication while at work, misconduct connected with his work, *Cassar* v. *Employment Security Commission,* 343 Mich 380, et cetera). The "benefit year," then, is more than a chronological succession of calendar weeks. It is an acquired status. It must be "established" by performance and compliance. And once established it carries with it both rights and privileges. Thus there is a right to money payments, and there is the privilege of the receipt of additional benefits without serving a new waiting period week. (Section 28[d].)

The monetary payments payable during any benefit year are determined by a formula contained in section 27(d). It provides, in substance, that:

"The amount of benefits to which an individual who is otherwise eligible shall be entitled during any 1 benefit year from an employer with respect to employment during the base period, is the amount obtained by multiplying the weekly benefit rate with respect to such employment by 2/3 of the number of credit weeks earned in such employment." (CLS 1954, § 421.27[d] [Stat Ann § 17.529 as amended by PA 1954, No 197].)

(The "credit weeks" here employed are defined, in section 50, as those weeks in which earnings were in excess of $8 per week, to a limit of 30 weeks [under the act as it provided in October of 1953*], which weeks had neither been canceled nor charged off.)

Such being the scheme of the act, we proceed to an examination of the amendment, above quoted. Since it took effect "before May 15, 1954" the first clause of the amendatory section controls. In it the beneficiaries are carefully defined: Each person, it says, who had current an unexpired benefit year is to receive an adjustment. Having thus specified the recipients of the amendatory adjustment, the act proceeds to spell out the amount thereof. The adjustment, it provides, shall reflect an increase in weekly rate and/or maximum amount arrived at by applying amended sections 27 and 50 to the benefit rights unexpired prior to June 27, 1954. (The last-mentioned sections, 27 and 50, are those having to do with payment of benefits, and computation of credit weeks, which we have hereinabove examined.)

The formula, thus amended, must be applied to something in order to determine the adjustment due. It is at this point that we reach the heart of the con-

---

* See PA 1951, No 251.—REPORTER.

troversy. The amendment provides that it is to be applied "on that portion of his benefit rights which were not exhausted prior to June 27, 1954." If "benefit rights," simply means money payments remaining to be paid under the old law, claimant has nothing on which the formula may operate since it is conceded that she has drawn her 20th check, the last payment under the unamended act. What, then, is the meaning of "benefit rights" as that term is used in the amendment?

It is urged upon us that we compare former transition provisions, and review the legislative history, and that of former administrative interpretations, in our quest. We have done so but find that clarity is not induced thereby. Certain of the sections to which we are referred (*e. g.,* PA 1942 [2d Ex Sess], No 18, § 60[a]), refer only to "benefits," while others, referring to "benefit rights," involve only an adjustment of the weekly benefit rates. We share, with the trial court, the opinion that: "The history of the administrative interpretation offers no help because the language and contents of previous transition sections differ."

The statute itself, within its 4 corners, seems to contain the answer to the question how it should be applied. Much of the confusion in the case has been engendered by failure to observe the cardinal principle that words which have received statutory definition in an act must be given such meaning by the courts in construing the act, regardless of other possible, or even common, meanings. Thus the act before us contains a definition of the word "benefits." It "means the money payments payable to an eligible and qualified individual." (Section 51*.) We will so construe it. What, then, are "benefit rights"? Our act, unlike certain others, does not explicitly

---

* PA 1936 (Ex Sess), No 1, § 51, as amended by PA 1951, No 251.— Reporter.

define them, but it is not silent with respect thereto. We find in section 27(f) a description of the "benefit rights" of veterans which, it is said, "shall be determined in accordance with the provisions of this subsection." It is then provided (after certain definitive terms) that the veteran's first benefit year following termination of his military service shall be 52 weeks, and that he

"shall be eligible for benefits during such benefit year only if he has had 14 or more weeks of employment in the base period applicable thereto, in each of which he earned in excess of $15 in wages from employers. The weekly benefit rate and the maximum limitation on total benefits shall otherwise be computed in accordance with the provisions of subsections (b) and (d) of this section; and benefits paid during such a benefit year shall be charged to employers' rating accounts in accordance with section 20 of this act.

"(6) The veteran shall be subject to the provisions of sections 28 and 29 of this act. In addition, no veteran shall be eligible to receive benefits based on employment by an employer with respect to which he has reemployment rights under the Federal selective service act unless and until he has made application for reemployment by such employer in accordance with the provisions of said act.

"(7) If any act of congress shall provide for payments with respect to unemployment of individuals who have completed a period of military training service subsequent to June 24, 1950, then any such payments under such act of congress shall be deducted from the benefits payable under this subsection." PA 1936 (Ex Sess), No 1, § 27(f)(5)(6)(7), as amended by PA 1954, No 197.

"Benefits," then, both under the definition in section 51 and as used in this section, means money payments to one who has, in accordance with the terms of the act, established his right thereto. And what

·is the nature and content of these rights which he has ·thus established? If eligible (under section 28), and ·not disqualified (under section 29), the unemployed worker is entitled, during and because of his "established" benefit year, to whatever recurring weekly ·sum is authorized by the legislature for the relief of the unemployed, until he reaches the prescribed maximum. The term "benefit rights," then, is descriptive of continuing rights in the claimant, established by certain performances on his part, entitling him to compensation, *i. e.*, "benefits," sums payable at specified intervals over an established period of time.

What we have said with respect to the benefit of veterans is also, it is clear, applicable to benefit rights generally under the act. Thus section 32(b) speaks of the procedure for determining "the claimant's benefit rights" and we note that the record before us contains a "Notice of Determination of Benefit Rights" which contains an enumeration of various elements comprising what we have described as the benefit rights: the weekly payment and the maximum amount within the established benefit year. At ·the bottom thereof we observe the notation: "Benefits"—not benefit rights—"Exhausted." The terminology thus employed was accurate.

With these principles in mind let us return to the situation of Mrs. Melia on May 7, 1954, the effective date of the amendment. At this time she was one of the group specifically described in the amendment, those "for whom there is current an unexpired benefit year established prior to June 27, 1954." Prior to the amendment, however, her maximum amount of compensation was limited to 20 weeks, which maximum was available only to those with 30 "credit weeks" of employment. (The ratio employed was 1-1/2 credit weeks for 1 benefit week.) After the amendment, the ratio being unchanged, she was

entitled to a maximum amount of 26 weeks of benefit in and because of her established benefit year, since she actually had had over 39 credit weeks of employment in the base period. It is clear, then, that she had benefit rights, which she could convert into cash during and because of the existence and continuation of her benefit year, to the maximum amount payable under the statute as amended.

The short of it is that Mrs. Melia's rights under the act were a statutory composite. They were not exhausted when the last weekly payment was made to her under the unamended act. This, strictly speaking, and under the statutory definition, was merely the exhaustion of the then-prescribed "benefits," the money payments then required to be made. Her rights to unemployment compensation, having once been established, and being uncancelled (section 46), with eligibility continuing, remained with her, alive, unabated and unexhausted for the duration of her established "benefit year." Thus when the legislature liberalized the act, she, having the prescribed status, being an individual "for whom there is current an unexpired benefit year established prior to June 27, 1954," was entitled to the aid thereof. We observe, in passing, that the contrary construction deprives those most in need, those who had been longest out of work, whose benefits were exhausted, and whose need was the most desperate, of the financial help authorized by the amendment. We do not possess the dexterity to harmonize a result so cruel with the announced legislative objective of lessening the menace of prolonged and involuntary unemployment to the health, morals, and welfare of the people of this State.

Judgment should be affirmed. Costs to appellee.

BLACK, J., concurred with SMITH, J.

CARR, J. The material facts in this case are not in dispute. For some time prior to September 23, 1953, plaintiff was employed by the defendant Universal Products Company, Inc., which was engaged in carrying on business in Dearborn. On the date mentioned plaintiff was laid off for lack of work. Shortly thereafter she filed her claim for benefits under the provisions of the Michigan employment security act.* In accordance with statutory provisions then in effect she was allowed a primary weekly benefit rate of $27 based on 30 credit weeks. The last of the 20 payments then granted was collected on May 14, 1954.

At the legislative session of 1954 section 60 of the act was amended by PA 1954, No 197, in such manner as to increase the maximum amount of benefits payable to persons entitled thereto. As so amended, said section (CLS 1954, § 421.60) read as follows:

"Sec. 60. (a) If this amendatory act takes effect before May 15, 1954, then each individual for whom there is current an unexpired benefit year established prior to June 27, 1954, shall receive an adjustment reflecting any increase in his weekly benefit rate and/or maximum amount of benefits which will result from applying sections 27 and 50 of this act, as amended, on that portion of his benefit rights which were not exhausted prior to June 27, 1954; and in the case of benefit years established on or after June 27, 1954, the weekly benefit rate and maximum amount of benefits shall be computed in accordance with sections 27 and 50 of this act, as amended. If this amendatory act does not take effect before May 15, 1954, then the provisions of sections 27 and 50 of this act, as amended, relating to the weekly benefit rate and maximum amount of benefits, shall be

* PA 1936 (Ex Sess), No 1, as amended (CL 1948 and CLS 1954, § 421.1 *et seq.* [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 *et seq.*].)

applicable only to benefit years established after the effective date of this amendatory act."

Act No 197 was given immediate effect, and was approved May 7, 1954. On July 2d following, plaintiff filed a claim for further benefits, relying on the amendment. Her benefit year did not expire until September 25, 1954. Because of the situation in this respect it was, and is, plaintiff's claim, she having failed to obtain employment, that she was entitled to additional benefits in accordance with the amendment. The defendant commission denied the application on the ground that the benefits to which plaintiff was entitled were exhausted prior to June 27, 1954, and that the amendatory act did not entitle her to additional payments. An application for a redetermination was made, with a like result. Thereupon plaintiff appealed to a referee of the commission, before whom proofs were taken, with the result that the commission's action was sustained. The appeal board affirmed the holding of the referee. The proceeding was then reviewed by the circuit court of Wayne County on writ of certiorari, and the order of the appeal board was reversed. Thereupon, on leave granted, the intervening defendant, plaintiff's employer, appealed to this Court, claiming that the circuit judge erred in overruling the appeal board.

The controlling question at issue is the interpretation of section 60 as amended at the 1954 legislative session, above quoted. In considering the matter it must be borne in mind that the duty of the Court is to interpret the statute as we find it. The wisdom of the provision in question in the form in which it was enacted is a matter of legislative responsibility with which courts may not interfere. *Michigan & Vicinity Foundry Workers Union* v. *Enterprise Foundry Co.*, 321 Mich 265. As tersely

stated by Chief Justice BUTZEL in *Roosevelt Oil Company* v. *Secretary of State,* 339 Mich 679, 694, "It is the function of the court to fairly interpret a statute as it then exists; it is not the function of the court to legislate."

The cardinal rule of statutory construction is to ascertain and give effect to the intention of the legislature. If the language of a statutory provision is unambiguous, the intent must be determined accordingly. It is requisite that pertinent provisions of the act be considered together, to the end that the general plan and purpose of the law-making body may be ascertained. All parts of the specific provision to be construed must be given force and effect. This means that no phrase, or clause, or word, may be ignored in determining the construction of such provision. In the early case of *People* v. *Burns,* 5 Mich 114, 117, it was said:

"No rule is better settled than, in construing a statute, effect must be given to every part of it. One part must not be so construed as to render another part nugatory, or of no effect. The same rule applies to words, in construing a sentence."

Likewise, in *Attorney General, ex rel. Zacharias,* v. *Detroit Board of Education,* 154 Mich 584, 589, the Court accepted with approval the following statement from the opinion filed in the cause by 4 judges of the Wayne circuit court who heard the case:

" 'It is a cardinal rule of statutory construction that full effect shall be given to every part of the act under consideration. Every clause and every word is presumed to have some force and meaning. No portion should be rendered nugatory.' "

Of like import are: *United Insurance Co.* v. *Attorney General,* 300 Mich 200; *Baird* v. *Detroit Elec-*

*tion Commission,* 316 Mich 657.   See, also, *Williams* v. *Secretary of State,* 338 Mich 202.

The interpretation of section 60(a), as amended by the act of 1954, which the Michigan employment security commission, the referee, and the appeal board determined to be correct, is clearly stated in the opinion of the referee as follows:

"It should be noted that section 60(a) of the act provides that claimant shall be entitled to additional benefits on that portion of his benefit rights which were not exhausted prior to June 27, 1954.   According to the Webster International Dictionary the word 'exhausted' means 'emptied.'   Since in this case there were no more benefit rights left prior to June 27, 1954, the benefit rights have been exhausted. The word 'exhausted' is placed in the act for a purpose.   If there was an intention on the part of the legislature to allow additional benefits on all claims where the benefit year has not expired before June 27, 1954, there would be no need of placing the word 'exhausted' in the act.   The word 'exhausted' was placed in the act for the purpose of denying additional benefits on all claims where the benefit year has not expired before June 27, 1954, and on which claims all benefits allowed have been collected before June 27, 1954.   The claimant's benefit rights were exhausted prior to June 27, 1954, within the meaning of the act and it is difficult to see how the act can be interpreted to allow additional benefits after June 27, 1954, when the benefit rights have been previously exhausted.   Before the amended act became effective June 27, 1954, the claimant had no right to additional benefits since there was no act effective prior to that day allowing additional benefits.   The claimant exhausted her benefits prior to June 27, 1954, the effective date of the amended act, and consequently she would not be entitled to additional benefits under the amended act."

It is pointed out in the brief filed by the attorney general's department on behalf of the defendant commission that the phraseology of the 1954 amendment was not at variance with corresponding language in prior amendments to said section. Thus in PA 1945, No 335, the commission was authorized to grant benefits under the amended act to any claimant whose benefit year should begin subsequent to March 31, 1945. It was further declared that:

"With respect to any individual for whom there is current a benefit year, established prior to April 1, 1945, and which has not expired prior to that date, the duration of benefits and the weekly benefit amount as established in the original determination shall be adjusted to permit such individual to receive an increase in his weekly benefit amount and the duration of his benefits on that portion of his benefit rights which were not exhausted prior to April 1, 1945."

PA 1949, No 282, which was given immediate effect and approved June 11, 1949, provided that:

"With respect to any week of unemployment beginning on or after July 3, 1949, an individual for whom there is current an unexpired benefit year established prior to July 3, 1949, shall receive an adjustment of his weekly benefit rate and maximum amount of benefits in accordance with section 27 of this act, as amended, on that portion of his benefit rights which were not exhausted prior to July 3, 1949."

Practically identical language was used in PA 1951, No 251, which amended section 60 in such manner as to provide for a transition from the prior benefit rates to the application of the amended act. It thus appears that in the specific amendment under consideration here the legislature was, in substance, repeating the language of prior amendments. On

behalf of defendant commission it is stated that the same interpretation had been placed by it on the prior amendments as it now claims should be given to the provision of the act of 1954 in question.   In *Chrysler Corp.* v. *Smith,* 297 Mich 438 (135 ALR 900), it was held that:

"The executive interpretation given a law by officials charged with its administration must be presumed to have been known to the legislature so that such construction would be carried with it and sanctioned when the legislature amends the statute and reenacts the language so construed." (Syllabus 7.)

In *City of Hazel Park* v. *Municipal Finance Commission,* 317 Mich 582, 605, the Court quoted with approval from *Aller* v. *Detroit Police Department Trial Board,* 309 Mich 382, 386, as follows:

" 'It is well settled that the construction placed upon statutory provisions by any particular department of government for a long period of time, although not binding upon the courts, should be given considerable weight.' "

Said principle was recognized by the supreme court of the United States in *United States* v. *Jackson,* 280 US 183, 193 (50 S Ct 143, 74 L ed 361).

It is suggested that the legislature must be presumed to have had in mind, in the enactment of the amendment of 1954, the interpretation placed by the administrative department on prior amendments containing like language, and that such interpretation was tacitly approved.   However, and without reference to the interpretation given to prior amendments, we are impressed that the language used is sufficiently clear and specific as to leave no reasonable doubt as to what the legislature meant.   Section 27, referred to in the amendment, relates to the payment of benefits from the fund created under the direction of the legislature, and section 50 deals with

the matter of "credit weeks" with reference to which the rate of payment in each instance is to be determined. It may not be said that either section enters directly into the determination of the question now before us, that is, the interpretation of section 60(a).

It will be noted that the legislature did not see fit to declare that any person having an unexpired benefit year, at the time of the taking effect of the act, or on June 27, 1954, should receive an increase in his weekly benefit rate and in the maximum amount of benefits under amended sections 27 and 50. Had the legislature intended that the provision should be given the construction now contended for on behalf of plaintiff, we have no doubt that specific and unequivocal language would have been used to accomplish that end. It clearly appears from the language used that the additional benefits provided for by the act as amended were to be computed in each instance on that portion of "benefit rights which were not exhausted prior to June 27, 1954." Certainly the term "exhausted" is not ambiguous. Under CLS 1952, § 8.3 (Stat Ann 1952 Rev § 2.212), the word must be construed in accordance with "common and approved usage." It means consumed; used up; spent. (See Webster's New International Dictionary.) Unquestionably in the instant case plaintiff's rights to benefits, determined as of the time when such benefits were granted to her in 1953, were used up prior to the 27th of June, 1954.

In the enactment of the so-called "transition provisions" in the 1954 amendment, as well as in the prior amendments to section 60, above referred to, the legislature obviously felt impelled to establish a dividing line as between those having current benefit years who should be granted increased rights under the amended provisions of the statute, and those to whom such increases should not be granted. The

matter was settled in the amendment now in question by fixing June 27, 1954, as the dividing line. As to those who under their awards were entitled to payments thereafter, having benefit rights not exhausted prior to that day, it was specified that sections 27 and 50 should be applied to such unexhausted payments. On the other hand, those who had exhausted their rights prior to the date fixed were left with no basis on which to compute additional benefits. In other words, the legislature drew the line, as of a certain date, between those having current benefit years who might receive additional benefits, and those who might not do so, fixing as the controlling feature whether benefit rights had been exhausted prior to June 27, 1954. As before indicated, this was wholly a matter for legislative determination. This Court is without authority to construe the amendment other than in accordance with its specific provisions.

The employment security commission, the referee, and the appeal board interpreted correctly the amendment in question. The argument advanced on behalf of plaintiff implies that every employee having on June 27, 1954, a benefit year previously established would be entitled to additional benefits by virtue of the 1954 enactment. Such result would follow even though the right to receive benefits pursuant to the order previously made had been exhausted by payment months previously. We cannot agree that such was the intention of the legislature. The construction contended for on behalf of plaintiff would result, in practical effect, in rendering nugatory the phrase requiring the basing of additional benefits to which an applicant might be entitled on "that portion of his benefit rights which were not exhausted prior to June 27, 1954." Said phrase may not be nullified. It supplies the answer to the question as to the legislative intent.

The judgment of the circuit court is reversed, but without costs, a question of statutory interpretation being involved.

Dethmers, C. J., and Sharpe, Boyles, and Kelly, JJ., concurred with Carr, J.

Edwards, J., took no part in the decision of this case.