THE SOAP & DETERGENT ASSOCIATION v NATURAL
RESOURCES COMMISSION

Docket No. 47660. Submitted November 14, 1980, at Detroit.—Decided
February 17, 1981. Leave to appeal applied for.

The Soap and Detergent Association, Amway Corporation, and
Monsanto Company brought an action in Wayne Circuit Court
challenging the authority of the Natural Resources Commission
(NRC) to promulgate a rule limiting the amount of phosphorus
in cleaning agents sold in Michigan to 0.5%. Plaintiffs sought
preliminary and permanent injunctions against enforcement of
the rule and a judgment declaring the rule void and unenforce-
able. The court, Myron H. Wahls, J., upheld the rule and
granted summary judgment in favor of defendants, Natural
Resources Commission, Department of Natural Resources
(DNR), Water Resources Commission (WRC), Governor William
G. Milliken, Howard A. Tanner and Frank J. Kelley. Plaintiffs
appeal, contending that 1) the trial court erred in finding that
executive orders transferred the WRC's rule-making power to
the NRC, 2) that the governor was not empowered to reassign
rule-making authority from one entity to another, and 3) that
the previous statutorily imposed limit on phosphorus could not
be further restricted by administrative rule. *Held:*

1. The governor intended to vest the WRC's rule-making
authority under the cleaning agents act in the NRC, as head of
the DNR. The court's finding was not erroneous.

2. The governor was empowered by Const 1963, art 5, § 2 to
reassign rule-making authority from one entity to another.

3. The cleaning agents act, which had imposed the previous
8.7% limit on the amount of phosphorus allowed in cleaning
agents sold in Michigan, allows further restriction beyond the
8.7% limit.

Affirmed.

1. Statutes — Executive Orders — Legislative Disapproval —
   Force of Law.
   There is no basis on which to distinguish between an executive

REFERENCES FOR POINTS IN HEADNOTES
[1] 73 Am Jur 2d, Statutes §§ 56, 70-76.
[2] 73 Am Jur 2d, Statutes §§ 145, 146.

order and a statute once the executive order survives potential legislative disapproval and achieves the force of law.

2. STATUTES — JUDICIAL CONSTRUCTION — INTENT OF LEGISLATURE.

The primary purpose of statutory interpretation is to determine the Legislature's intent, while giving effect to each word, phrase and section of a statute.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Thomas L. Munson, Robert D. Dunwoodie* and *Bowden V. Brown), (Baker & Hostetler,* and *John E. Stephen,* General Counsel, Amway Corporation, of counsel), for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Stewart H. Freeman* and *Susan G. Peck,* Assistants Attorney General, for defendants.

Before: BRONSON, P.J., and J. H. GILLIS and CYNAR, JJ.

J. H. GILLIS, J. This appeal challenges the Natural Resources Commission's power to promulgate 1979 AC R 323.1173(4) [1977 AACS R 323.1173(4)],[1] which limits the amount of phosphorus in cleaning agents sold in Michigan to 0.5%. The underlying lawsuit was filed by The Soap and Detergent Association, a trade association, Amway Corporation, a manufacturer of cleaning agents and household laundry detergents sold in Michigan, and Monsanto Company, a manufacturer of phosphates used in some detergents and cleaning agents.

Suit was filed on August 26, 1977, seeking preliminary and permanent injunctions against enforcement of the rule and a judgment declaring

---

[1] 1979 AC R 323.1173(4) states that: "After October 1, 1977, a person shall not sell or distribute for use in this state a household laundry detergent which contains phosphorus in any form in excess of 0.5% by weight, expressed as elemental phosphorus."

the rule void and unenforceable. Plaintiffs appeal from the trial court's opinion filed June 6, 1979, which upheld the rule. Summary judgment for defendants was entered on September 17, 1979.

I

In 1961, the Constitutional Convention met in Lansing to draft a new state constitution. One of the most extensively discussed subjects was the reorganization of the executive branch of the state government. From a welter of state departments, agencies and commissions, the delegates hoped to secure for the citizens of this state a carefully planned network of offices, arranged in terms of the concerns each entity was obligated to oversee. To that end, the executive branch committee proposed the following addition to the Constitution:

"Sec. b. The lieutenant governor shall be president of the senate, but shall have no vote [except in case of equal division. He shall perform such additional duties as may be delegated to him by the governor.

"All executive and administrative offices, agencies and instrumentalities of the state government and their respective functions, powers and duties, except for the offices of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall be allocated by law among and within not more than 20 principal departments, so as to group them as far as practicable according to major purposes. Temporary commissions or agencies for special purposes and with a life of no more than 2 years may be established by law and need not be allocated within a principal department.

"The allocation of departments by law pursuant to this section shall be completed within 2 years after the effective date of this constitution. If such allocation shall not have been completed within such period, the

governor, within one year thereafter, by executive order, shall make such allocation.

"Subsequent to such allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders. The legislature shall have 60 days of a regular session, or a full session if of shorter duration, to disapprove these executive orders. Unless disapproved in both houses by a resolution concurred in by a majority of the members elect of each house, these orders shall become effective at a date thereafter to be designated by the governor]." 1 Official Record, Constitutional Convention 1961, p 1766.

The reasoning offered in support of this language was stated in pertinent part as follows:

"This proposal contains the major recommendations of the committee on executive branch for strengthening and improving the constitutional provisions for the executive branch in Michigan state government. The members of the committee are agreed that significant modifications are needed in the executive article of the constitution. Most of the recommendations in this proposal have the unanimous support of members of the committee.

\*  \*  \*

"The proposal suggests new language concerning the allocation of departments, procedure for administrative reorganization, the appointment and removal of department heads, and the supervision of departments by the governor. \* \* \*.

"The objective of the recommendation to place a limit of 20 on the number of principal departments is to reduce the number of agencies under the direct supervision of the governor to manageable proportions, and to bring about a more effective grouping of departments according to major purposes.

\*  \*  \*

"Another recommendation in the proposal gives constitutional status to the approach to administrative reorganization contained in Michigan public act 125 of 1958. This gives initiative in administrative reorganization to the governor with opportunity for rejection by the legislature of the governor's plans for reorganization. * * * The committee believes that this procedure offers the best prospect of continuous reappraisal and adjustment of the state's administrative structure, following the initial reallocation of departments.

"In choosing among several possible alternatives as to the requirement for legislative rejection of a reorganization plan, the committee favored a provision for rejection by a majority of the members elect of both houses of the legislature." 1 Official Record, Constitutional Convention 1961, pp 1767-1768.

During the course of the convention, the delegates extensively debated the provision regarding legislative disapproval of executive orders changing the initial allocation of departments. 2 Official Record, Constitutional Convention 1961, pp 1842-1854. The predominant basis for concern was that, unless the Legislature could more easily disapprove such executive orders, the proposed language gave the governor "tremendous political power * * * to, at will, * * * alter the operations, the functions, the responsibilities of the departments in his branch". Comments of Delegate J. Edward Hutchinson, 2 Official Record, Constitutional Convention 1961, p 1844. Proponents of a strong gubernatorial power in this area analogized to business, stating that the executive branch could best be operated in a businesslike manner if the politician legislators were not involved because legislators are too vulnerable to manipulation by outside interests. Comments of Delegate Arthur J. Madar, 2 Official Record, Constitutional Conven-

tion 1961, p 1851. Never was this debate qualified by the suggestion that the governor's power to reallocate was any less extensive than the Legislature's power. Indeed, the intent seemed to be to strike a balance between the governor's ability to veto any legislative act and the Legislature's ability to disapprove any executive orders. See, Comments of Delegate Melvin Nord, 2 Official Record, Constitutional Convention 1961, p 1847.

The reorganization provision in the final proposed constitution, as adopted by the electorate, is substantially similar to the proposal made by the executive branch committee with regard to the reorganization of the executive branch. Const 1963, art 5, § 2, states as follows:

"All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties, except for the office of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall be allocated by law among and within not more than 20 principal departments. They shall be grouped as far as practicable according to major purposes.

"Subsequent to the initial allocation, the governor may make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration. Where these changes require the force of law, they shall be set forth in executive orders and submitted to the legislature. Thereafter the legislature shall have 60 calendar days of a regular session, or a full regular session if of shorter duration, to disapprove each executive order. Unless disapproved in both houses by a resolution concurred in by a majority of the members elected to and serving in each house, each order shall become effective at a date thereafter to be designated by the governor."

Pursuant to the authority vested in it by art 5, § 2, the Legislature enacted the Executive Organization Act of 1965, 1965 PA 380, MCL 16.101 *et seq.;* MSA 3.29 (1) *et seq.* This act listed the Department of Conservation as one of the principal departments required by art 5, § 2. See, MCL 16.104(10); MSA 3.29(4)(10), and MCL 16.350 to 16.360; MSA 3.29(250) to 3.29(260). By MCL 16.357; MSA 3.29(257), the Water Resources Commission (WRC), as created by MCL 323.1; MSA 3.521, was transferred to the Department of Conservation.

The WRC transfer was characterized as a type I transfer.[2] Thus, while the WRC would be "administered under the supervision of th[e] principal department", the Department of Conservation, the WRC would nevertheless continue to "exercise its prescribed statutory powers, duties and functions of rule making * * * independently of the head of the department".[3] Because the WRC had previously been empowered to do certain things under MCL 323.1 *et seq.;* MSA 3.521 *et seq.,* the type I transfer left these obligations intact.

In 1972, the cleaning agents act became effective. MCL 323.231 *et seq.;* MSA 3.533(301) *et seq.* Under this act, the amount of phosphorus in clean-

[2] MCL 16.103(a); MSA 3.29(3)(a) defines a type I transfer as follows: "Under this act, a type I transfer means the transferring intact of an existing department, board, commission or agency to a principal department established by this act. When any board, commission, or other agency is transferred to a principal department under a type I transfer, that board, commission or agency shall be administered under the supervision of that principal department. Any board, commission or other agency granted a type I transfer shall exercise its prescribed statutory powers, duties and functions of rule-making, licensing and registration including the prescription of rules, rates, regulations and standards, and adjudication independently of the head of the department. Under a type I Transfer all budgeting, procurement and related management functions of any transferred board, agency or commission shall be performed under the direction and supervision of the head of the principal department."

[3] *Id.*

ing agents sold in Michigan was restricted to 8.7% by weight. MCL 323.232; MSA 3.533(302). Further, the WRC was empowered to promulgate rules, pursuant to the Administrative Procedures Act of 1969, 1969 PA 306, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.,* which "may further restrict the nutrient[4] content and other contents of cleaning agents and water conditioners * * *". MCL 323.233; MSA 3.533(303).

By Executive Order 1973-2, the governor designated the Department of Natural Resources (DNR) and the Natural Resources Commission (NRC) as the state entity responsible for development and coordination of all environmental functions and programs in Michigan.[5] See, MCL 299.11; MSA 13.20(1). The "statutory authority, powers, duties, functions, and responsibilities" of the WRC under MCL 323.1; MSA 3.521 were transferred to the DNR by a type II transfer,[6] such that the WRC's sole function would be to serve the NRC and staff in an advisory capacity. By Executive Order 1976-8, however, this transfer was hybridized as follows:

---

[4] MCL 323.231(b); MSA 3.533(301)(b) defines a nutrient as follows: " 'Nutrient' means a substance or combination of substances that, when added to any waters of the state in sufficient quantities, provides nourishment that promotes the growth of aquatic vegetation in the waters to such densities as to interfere with or be detrimental to their use by man or by any animal, fish or plant useful to man."

[5] In 1968, the Department of Natural Resources was created by MCL 16.350; MSA 3.29(250). The head of that department is the Natural Resources Commission. MCL 16.351; MSA 3.29(251). By MCL 16.352; MSA 3.29(252), the Department of Conservation was transferred to the DNR by a type I transfer.

[6] MCL 16.103(b); MSA 3.29(3)(b) defines a type II transfer as:

"Under this act, a type II transfer means transferring of an existing department, board, commission or agency to a principal department established by this act. Any department, board, commission or agency assigned to a type II transfer under this act shall have all its statutory authority, powers, duties and functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and procurement, transferred to that principal department.

"The statutory authority, powers, duties, functions and responsibilities of the Water Resources Commission created under Section 1, Act 245, PA 1929, as amended, being Section 323.1 of the Compiled Laws of 1948, are hereby transferred to the Department of Natural Resources by a Type II transfer as defined by Section 3(b) of Act 380 of the Public Acts of 1965, *except that* the Water Resources Commission shall continue to exercise independent authority with respect to quasi-judicial functions, rule-making, and issuance of permits and orders in the water pollution control functions, as specified in Section 2, Section 5, subsection (1) of Section 7, and subsection (b) of Section 8 of Act No. 245 of the Public Acts of 1929, as amended. In all other areas it shall serve in an advisory capacity to the Natural Resources Commission and staff."

Neither of the foregoing executive orders were disapproved by the Legislature.[7]

On August 26, 1977, the NRC promulgated R 323.1173(4), apparently on the authority conferred on the NRC by the above executive orders. That same day, the plaintiffs herein filed suit, alleging in pertinent part as follows: (1) that, as the 8.7% phosphorus limit established by the Legislature in MCL 323.232; MSA 3.533(302) could not be altered by any state agency, the rule promulgated by the NRC is invalid and unenforceable; (2) even if the legislative limit could be further restricted, the NRC acted improperly because that authority was vested in the WRC by statute and the governor's executive orders could not transfer that authority away from the WRC;[8] (3) the governor's use of a type II transfer was invalid because only the Legislature could utilize such procedures under the

[7] Executive Order 1973-2a, issued before Executive Order 1976-8, purported to effect the WRC transfer. It will not be discussed, however, because Executive Order 1976-8 abrogated its effect.

[8] This argument posited that the governor could only reassign functions, and rule making is a power rather than a function.

Executive Organization Act of 1965; (4) the purpose of the executive orders was negated by the failure to reenact and republish the cleaning agents act, since that act was amended to make the NRC the administrative authority rather than the WRC;[9] (5) the NRC's rule is invalid because it was promulgated in violation of the Administrative Procedures Act of 1969.

The trial court's opinion granting summary judgment in defendants' favor reasoned as follows: (1) the cleaning agents act does not prohibit any further restriction of the 8.7% limit enacted by the Legislature, but, in fact, permits "further" restriction of the nutrient content of cleaning agents; (2) the executive orders effected a transfer of the WRC to the DNR and its head, the NRC, and the WRC and the DNR thus have concurrent jurisdiction as to rule making, since the WRC cannot have greater jurisdiction in that regard; (3) pursuant to plaintiffs' agreement, their argument as to the potential violation of the administrative procedures act was not decided.

## II

The first issue raised by plaintiffs is whether the trial court erred in finding that the executive orders transferred rule-making power to the NRC. Our review persuades us that this finding was not in error.

Executive Order 1976-8 transferred the WRC to the DNR by a type II transfer. The use of that term indicates that the governor sought to transfer *all* of the transferred commission's statutory authority, powers, duties and functions to the principal department. MCL 16.103(b); MSA

---

[9] This claim was not pursued on appeal.

3.29(3)(b). The transfer was qualified, however, by the statement that the WRC should "continue to exercise independent authority with respect to * * * rule-making * * * in the water pollution control functions, as specified in" MCL 323.2; MSA 3.522, MCL 323.3; MSA 3.523, MCL 323.7(1); MSA 3.527(1), and MCL 323.8(b); MSA 3.528(b).

The exception to the transfer named three responsibilities of the WRC which it would continue to fulfill independently of the DNR/NRC. These three responsibilities were characterized as "specified" in certain statutes. The statutes concern the WRC's authority in the area of waste discharge into state water. If these statutes were the only statutes under which the WRC was empowered to promulgate rules, there would be little question that the NRC was not directly empowered to promulgate rules under Executive Order 1976-8. As noted above, however, the WRC had also been empowered to make rules under the cleaning agents act. MCL 323.231 *et seq.; MSA* 3.533(301) *et seq.* The cleaning agents act was enacted in 1972, long before Executive Order 1976-8 was issued. Thus, it seems clear that, by specifically transferring all of the WRC's statutory authority, powers, duties and functions to the DNR, except for those three areas of responsibility as to waste discharge, the governor intended that the DNR/NRC would assume the WRC's rule-making function under the cleaning agents act.

## III

Plaintiffs also challenge the NRC's promulgation of 1979 AC R 323.1173(4), by arguing that, under Const 1963, art 5, § 2, the governor was not empowered to reassign rule-making authority from one entity to another. This argument is premised

on the fact that art 5, § 2, directed the Legislature to allocate all executive and administrative offices, agencies and instrumentalities, "and their respective functions, powers and duties", within not more than 20 principal departments. The governor, on the other hand, may, after the initial allocation, "make changes in the organization of the executive branch or in the assignment of functions among its units which he considers necessary for efficient administration". Plaintiffs claim that rule making is a power, rather than a function, and that the governor thus has no constitutional power to reassign rule-making authority.

There are several reasons why we reject plaintiffs' argument. The first reason is that our review of the Constitutional Convention record reveals no intent to distinguish between the governor's power and that of the Legislature under art 5, § 2. Rather, the challenged language was apparently interpreted as conferring equal reorganization power on both the governor and the Legislature. 2 Official Record, Constitutional Convention 1961, pp 1842-1854.

Second, § 7(b) of the Executive Organization Act of 1965, 1965 PA 380, § 7(b); MCL 16.107(b); MSA 3.29(7)(b), lists rule making as a statutory function which is transferred to the head of a principal department by a type II or type III transfer. Thus, the Legislature itself has interpreted rule making as a function which may be transferred during the executive reorganization.

Third, MCL 16.109; MSA 3.29(9) states that "[t]he head of each principal department * * * may promulgate such rules and regulations as may be necessary to carry out the functions now or hereafter vested in them" in accordance with specified statutes regarding rule making in gen-

eral. Thus, the Legislature has itself provided the means by which a reassigned function may be implemented by the "receiving" department. Because the Executive Organization Act of 1965 was enacted pursuant to the same constitutional mandate under which the governor issued Executive Order 1976-8, we see no reason to restrict the operation of MCL 16.109; MSA 3.29(9) to cases in which a new function is vested in a department head by the Legislature rather than the governor. In this conclusion we specifically refer to that portion of art 5, § 2, which operates to give executive orders the force of law if they are not disapproved by the Legislature. Once an executive order survives potential legislative disapproval, and achieves the force of law, there is no basis on which to distinguish between it and a statute; each has passed the scrutiny of the Legislature and deserves to be enforced as such.

# IV

Given that the DNR/NRC was intended to exercise the WRC's rule-making authority under the cleaning agents act, and that the governor was empowered to transfer such authority from the WRC to the DNR/NRC, the next question is whether the 8.7% statutory limit on phosphorus could be further restricted by administrative rule. MCL 323.233; MSA 3.533(303) directs that the WRC "shall promulgate rules" in compliance with the administrative procedures act, which

"[M]ay further restrict the nutrient content and other contents of cleaning agents and water conditioners, to prevent unlawful pollution and control nuisance growths of algae, weeds and slimes which are or may become injurious to other lawful water uses, to prevent

cleaning agents and water conditioners, separately or in combination with other substances, from rendering or tending to render any waters of this state harmful or inimical to public health, or to animal or aquatic life, or to beneficial water uses, and to minimize any hazard to the health or safety of users of the cleaning agents or water conditioners."

The crucial words in this statute are "further restrict the nutrient content of cleaning agents". Nutrient is defined in MCL 323.231(b); MSA 3.533(301)(b), as follows:

" 'Nutrient' means a substance or combination of substances that, when added to any waters of the state in sufficient quantities, provides nourishment that promotes the growth of aquatic vegetation in the waters to such densities as to interfere with or be detrimental to their use by man or by any animal, fish or plant useful to man."

The parties agree, and we concur, that phosphorus is a nutrient. We also conclude that the word "further" can have no meaning at all unless it applies to the right to alter the 8.7% limit on phosphorus. No other substance has yet been addressed by the Legislature, so no rule would have the effect of further restricting the nutrient content of a cleaning agent except for a rule regarding phosphorus. Moreover, since the phosphorus limit set by the Legislature was enacted simultaneously with the section permitting further restriction of nutrient content, the Legislature could have easily prohibited agency alteration of that limit. It did not do so, and we will not presume to imply such a prohibition.

The primary purpose of statutory interpretation is to determine the Legislature's intent, while giving effect to each word, phrase and section of a

statute. *Melia v Employment Security Comm,* 346 Mich 544, 562; 78 NW2d 273 (1956). The foregoing conclusion achieves this purpose. Accordingly, consistent with our conclusion that the DNR/NRC was intended to exercise the WRC's rule-making authority in the area not involved with waste discharge, we here conclude that the trial court did not err in upholding the validity of R 323.1173(4).

## V

Our conclusions on the foregoing issues render unnecessary any further discussion. To summarize, we have determined that the governor intended to vest the WRC's rule-making authority under the cleaning agents act in the NRC, as head of the DNR. We are persuaded that he was empowered to do this under Const 1963, art 5, § 2, both because the drafters of the Constitution intended that the governor's authority be coequal to that of the Legislature, and because, once the WRC's function under the cleaning agents act was reassigned, MCL 16.109; MSA 3.29(9) empowers the NRC to promulgate the rules necessary to carry out that function. Finally, we interpret MCL 323.233; MSA 3.533(303) as permitting further restriction on the 8.7% maximum limit of phosphorus in cleaning agents.

Affirmed.