SOAP & DETERGENT ASSOCIATION v NATURAL RESOURCES
COMMISSION

Docket No. 66789. Argued June 9, 1982 (Calendar No. 4).—Decided
December 23, 1982.

The Soap & Detergent Association, Amway Corporation, and the
Monsanto Company brought an action against the Natural
Resources Commission, the Department of Natural Resources,
the Water Resources Commission, the Governor, the Director of
the Department of Natural Resources, and the Attorney General
seeking injunctive relief from the enforcement of a rule
promulgated by the Natural Resources Commission under the
cleaning agents act which forbids the sale or distribution of
household laundry detergent containing phosphorus in any
form in excess of 0.5% by weight and a judgment declaring the
rule void. The Wayne Circuit Court, Theodore R. Bohn, J.,
denied relief and, in a final judgment, upheld the rule. The
Court of Appeals, Bronson, P.J., and J. H. Gillis and Cynar, JJ.,
affirmed (Docket No. 47660). The plaintiffs appeal, alleging that
the Natural Resources Commission did not have the authority
to promulgate the rule because the Legislature had pre-emptively
set the limit at 8.7%, because the Governor did not have
the authority to transfer the rulemaking power from the Water
Resources Commission to the Natural Resources Commission,
and because the Governor had not so transferred the power.

In an opinion by Justice Williams, joined by Chief Justice
Fitzgerald and Justices Kavanagh and Ryan, the Supreme
Court *held:*

The Legislature did not pre-empt the power to restrict the
nutrient phosphorus content of cleaning agents to an amount
less than the maximum ceiling prescribed in the cleaning
agents act, but delegated the power to the Water Resources
Commission. The constitution and the Executive Organization
Act granted the Governor the power to transfer powers between
executive agencies. The Governor, by executive order,
transferred the power to further restrict the nutrient phospho-

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 61A Am Jur 2d, Pollution Control § 9.
[4-6] 1 Am Jur 2d, Administrative Law § 25.

rus content of cleaning agents from the Water Resources Commission to the Natural Resources Commission, the head of the Department of Natural Resources.

1. The Legislature, in enacting the cleaning agents act, established minimum standards for the regulation of phosphorus in cleaning agents and delegated the power to promulgate rules to regulate the amount of nutrients and other contents of cleaning agents and the power to establish more stringent standards to the WRC. The cleaning agents act specifically provides that the sale or distribution of a cleaning agent containing phosphorus in any form in excess of 8.7% by weight is prohibited and that rules to enforce the act may be promulgated to further restrict the nutrient content of cleaning agents. This establishes 8.7% as the maximum, not the minimum, phosphorus content.

2. The Governor had the authority to transfer the rulemaking power of the WRC to the NRC under Const 1963, art 5, § 2, and the Executive Organization Act, which served as the enabling act of that provision of the constitution. The specific intent of the Constitutional Convention in fashioning art 5, § 2 was to delegate a very limited and specific legislative power to the executive with sufficient checks to restrain its exercise.

3. The Governor, by executive order, clearly and unambiguously transferred the power to further restrict the nutrient content of cleaning agents by promulgation of rule from the WRC to the NRC. The reservation of certain rulemaking powers to the WRC in the order specifically referred to its powers given in the 1929 act which established it. The transfer was not disapproved by the Legislature. Even if it were found that the WRC had concurrent statutory power, the power of the NRC to promulgate the rule at issue would not be affected.

Affirmed.

Justice Levin, joined by Justice Coleman, dissenting, would hold that the executive order of the Governor is ambiguous concerning the transfer of the rulemaking functions of the Water Resources Commission under the cleaning agents act to the Department of Natural Resources. The order transferred the statutory authority, powers, duties, functions, and responsibilities of the WRC to the DNR except the WRC's rulemaking powers under the WRC enabling act. No reason appears why the Governor would want to confer rulemaking powers of the WRC under other acts not mentioned in the executive order upon the DNR.

103 Mich App 717; 304 NW2d 267 (1981) affirmed.

OPINION OF THE COURT

1. ENVIRONMENT — WATER POLLUTION — CLEANING AGENTS — AD-
   MINISTRATIVE AGENCIES.

   The cleaning agents act prohibits the sale or distribution for use
   of cleaning agents containing phosphorus in excess of 8.7% by
   weight and provides that rules to enforce the act may be
   promulgated by the Water Resources Commission and that
   such rules may further restrict the nutrient content of cleaning
   agents (MCL 323.232, 323.233; MSA 3.533[302], 3.533[303]).

2. ENVIRONMENT — WATER POLLUTION — CLEANING AGENTS — AD-
   MINISTRATIVE AGENCIES — RULEMAKING POWER.

   The rulemaking power of the Water Resources Commission,
   including the power to enforce the cleaning agents act through
   promulgation of rules which restrict the nutrient content of
   cleaning agents, was transferred by executive orders to the
   Department of Natural Resources and its department head, the
   Natural Resources Commission.

3. ENVIRONMENT — WATER POLLUTION — CLEANING AGENTS — AD-
   MINISTRATIVE AGENCIES.

   The cleaning agents act, which sets a ceiling of 8.7% for phospho-
   rus content in cleaning agents and allows nutrients in cleaning
   agents to be further restricted by rule does not preclude pro-
   mulgation by the Natural Resources Commission of rules to
   enforce the act which require a more stringent limit on phos-
   phorus content of 0.5% (MCL 323.232; MSA 3.533[302]; 1979
   AC, R 323.1173[4]).

4. CONSTITUTIONAL LAW — EXECUTIVE ORDERS — EXECUTIVE AGEN-
   CIES — REORGANIZATION.

   Executive orders providing for changes in the organization of the
   executive branch of government or in the assignment of func-
   tions among the units of the executive branch, where not
   disapproved by the Legislature, have the effect of law (Const
   1963, art 5, § 2; MCL 16.101 *et seq.;* MSA 3.29[1] *et seq.*).

5. CONSTITUTIONAL LAW — EXECUTIVE ORDERS — EXECUTIVE AGEN-
   CIES — TRANSFER OF POWER.

   A transfer by executive order of the rulemaking power from one
   executive agency to another is a change in the organization of
   the executive branch of government (Const 1963, art 5, § 2;
   MCL 16.101 *et seq.;* MSA 3.29[1] *et seq.*).

DISSENTING OPINION BY LEVIN, J.

6. ADMINISTRATIVE LAW — EXECUTIVE AGENCIES — REORGANIZATION.

*The statutory authority, powers, duties, functions, and responsibilities of the Water Resources Commission were transferred by executive order to the Department of Natural Resources, excepting the rulemaking powers and certain other functions of the commission under its enabling act; there is no reason to conclude that the commission's rulemaking powers under other acts not specifically referred to in the executive order, including the cleaning agents act, were transferred to the department (MCL 323.1, 323.231; MSA 3.521, 3.533[301]).*

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Thomas L. Munson, Robert D. Dunwoodie,* and *Bowden V. Brown),* Baker & Hostetler (by *Shirley Z. Johnson)* of counsel, and *John E. Stephen,* General Counsel, Amway Corporation, for plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Stewart H. Freeman* and *Susan Peck Iannotti,* Assistants Attorney General, for defendants.

WILLIAMS, J.

I

The issue we are asked to address in this case is whether the authority to promulgate 1979 AC, R 323.1173(4), which regulates the phosphorus content permitted in cleaning agents, was lawfully delegated to the Natural Resources Commission, the head of the Department of Natural Resources.

This issue includes three subissues. First, did the Legislature pre-empt the power to "further restrict the nutrient content * * * of cleaning agents" in 1971 PA 226, or did it grant this power to the Water Resources Commission? Second, did the Governor have the authority to transfer this power to "further restrict" from the WRC to the

NRC by reason of Const 1963, art 5, § 2, and the Executive Organization Act? Third, did Executive Order No. 1976-8 in fact and in law transfer the power to "further restrict" from the WRC to the NRC, or did it reserve that power to the WRC?[1]

We find (1) that the Legislature properly delegated the rulemaking authority to regulate the phosphorus content of cleaning agents to the WRC; (2) that the Governor was properly vested with authority to transfer power between executive agencies; and that (3) Executive Order No. 1976-8 did transfer the challenged rulemaking power to the NRC. Therefore, 1979 AC, R 323.1173(4) is a validly promulgated rule.

## II. FACTS

In 1971, the Michigan Legislature passed the cleaning agents act, 1971 PA 226, MCL 323.231-323.236; MSA 3.533(301)-3.533(306), to protect water quality by restricting the content of cleaning agents. The statute prohibits the sale or use of cleaning agents which contain phosphorus in excess of 8.7% by weight expressed as elemental phosphorus. MCL 323.232; MSA 3.533(302). The statute further provides that the WRC shall promulgate rules to effectuate this statute, and that the rules "may further restrict the nutrient content and other contents of cleaning agents and water conditioners". MCL 323.233; MSA 3.533(303).

[1] This Court has not been asked to address the merits of the rule and, therefore, will assume that the rule represents a valid exercise of the police power. Similar rules have been upheld on the merits in Dade County, Florida, *Soap & Detergent Ass'n v Clark,* 330 F Supp 1218 (SD Fla, 1971); in Indiana, *Soap & Detergent Ass'n v Offutt,* 3 ERC 1117 (SD Ind, 1971); and in the City of Chicago, *Proctor & Gamble Co v Chicago,* 509 F2d 69 (CA 7, 1975), *cert den* 421 US 978 (1975) (no violation of the Commerce Clause).

In 1973, the Governor transferred all the statutory powers, duties and functions of the WRC to the Department of Natural Resources. Executive Order No. 1973-2. This executive reorganization was modified in 1976: the Governor reaffirmed the transfer of the WRC's "statutory authority, powers, duties, functions and responsibilities" to the DNR, *except that* the Water Resources Commission shall continue to exercise independent authority with respect to quasi-judicial functions, rule-making, and issuance of permits and orders in the water pollution control functions, as specified in Section 2, Section 5, subsection (1) of Section 7, and subsection (b) of Section 8 of Act No. 245 of Public Acts of 1929, as amended." Executive Order No. 1976-8 (emphasis in original). The head of the DNR is the Natural Resources Commission.

On August 26, 1977, the NRC promulgated Rule 323.1173(4), under the authority of the cleaning agents act. The rule provides:

"After October 1, 1977, a person shall not sell or distribute for use in this state a household laundry detergent which contains phosphorus in any form in excess of 0.5% by weight, expressed as elemental phosphorus."

Appellants—a manufacturer of cleaning agents and household detergents, a manufacturer of phosphates used in some detergents and cleaning agents, and their trade association—immediately filed suit seeking preliminary and permanent injunctions against the agencies and officials responsible for the rule's enforcement and a judgment declaring the rule void. On September 21, 1977, the Wayne Circuit Court denied the injunction. Judge Theodore R. Bohn eloquently explained that

an injunction to prevent enforcement of the phosphorus limiting rule would not maintain the status quo; each day of continued pollution would add to the destruction of Michigan's natural resources, a ravage that may be irreversible.[2]

Appellants then filed an application for emergency leave to appeal to the Court of Appeals,

[2] In his decision denying plaintiffs' request for a preliminary injunction, Judge Bohn wrote:

"Michigan has been bountifully blessed with a great number of water bodies. The People of Michigan, as well as tourists, relish this gift. Yet if care is not taken to protect our waters they will no longer be a blessing to us but rather a curse. In order to grasp the significance of the harm confronting the state it is necessary to examine the effect of phosphates on water quality.

"Eutrophication is the process of nutrient enrichment of water accompanied by a depletion of oxygen. Cultural eutrophication is the acceleration of the eutrophication of a body of water by reason of discharge into it of man-derived nutrients, particularly phosphorus and nitrogen. The immediate result of cultural eutrophication is increased production of algae and aquatic plants. Heavy growths of algae, a sign of rapid eutrophication, kill fish, cause water to taste and smell foul, and eventually destroy most productive life forms.

"Eutrophication may be controlled by reducing the level of one of the major nutrient elements, necessary for the life of the water body, below the level essential to its life. The nutrient in shortest supply in relation to all the other elements needed to create algal blooms is known as the limiting element. The more prevalent view in the scientific community is that phosphorus is the most likely nutrient for controlling eutrophication because of its comparative abundance in the waters and the more ready means for reducing its input into the waters. It is impracticable to attempt to remove other major nutrients, carbon and nitrogen, from the water. Carbon requirements of algae can normally be satisfied from carbon dioxide in the atmosphere, from the natural carbonate in water, and from bacterial degradation. Similarly nitrogen can be drawn from the atmosphere by blue-green algae and other types of algae. The logical deduction is that any concerted action to reduce the nutrient level in the waters must of necessity focus on the removal of the only major nutrient substantially controllable by man—phosphorus. See *Soap & Detergent Ass'n v Clark,* 3 ERC 1075 (SD Fla, 1971); Detergent Phosphate Ban, draft publication, Region V, Environmental Protection Agency.

"Plaintiffs asserted that since phosphate pollution has been going on for a number of years a few more weeks could not possibly hurt. This assertion lacks merit for each continued day of pollution makes the reversal process more difficult if not even impossible."

which was denied. The NRC rule went into effect on October 1, 1977.[3]

Appellants proceeded to file a motion for summary judgment in circuit court challenging the authority of the NRC to promulgate the rule. On June 6, 1979, the circuit court denied the motion. In a final judgment entered on September 17, 1979, the court upheld the rule as a lawful exercise of the NRC's authority. This decision was appealed to the Court of Appeals.

Upon review of the record and hearing of arguments, the Court of Appeals affirmed the circuit court's denial of appellant's motion for summary judgment. 103 Mich App 717; 304 NW2d 267 (1981). The Court of Appeals held that the Governor intended to transfer the WRC's authority under the cleaning agents act to the NRC, and that he was empowered to make this transfer by the Const 1963, art 5, § 2, and the Executive Organization Act, MCL 16.109; MSA 3.29(9). The Court of Appeals further found that the cleaning agents act authorizes further, more stringent restrictions on the phosphorus content of detergents below the 8.7% ceiling set by statute. 103 Mich App 731.

This Court granted leave to appeal on November 25, 1981. 412 Mich 863. Oral arguments were had before this Court on June 9, 1982.

## II. LEGISLATIVE PRE-EMPTION

The threshold inquiry which we must address is whether, in enacting a maximum limitation (8.7%) on the nutrient phosphorus content in cleaning agents, the Legislature intended to preclude an administrative agency from establishing further,

---

[3] The appellant manufacturers have substantially complied with Rule 323.1173(4)'s 0.5% limit on phosphorus.

more stringent standards. Clearly, if the Legislature sought to reserve to itself the regulation of the nutrient phosphorus, and therefore declined to delegate this regulatory power to *any* agency, subsequent challenges to the rule promulgated by the NRC become moot. It is beyond debate that the sole source of an agency's power is the statute creating it.[4] If a certain power, *e.g.,* regulation of phosphorus content in detergents, is withheld in the statute, the agency may not act. However, our reading of the cleaning agents act fails to disclose an intent by the Legislature to retain exclusive control over phosphorus pollution.

The cleaning agents act, which seeks to regulate the content of cleaning agents in order to protect water quality, is short and specific. Section 1 set forth the relevant definitions, including:

" 'Cleaning agent' means a laundry detergent, dishwashing compound, household cleaner, metal cleaner, degreasing compound, commercial cleaner, industrial cleaner, phosphate compound or other substance intended to be used for cleaning purposes.
" 'Nutrient' means a substance or combination of substances that, when added to any waters of the state in sufficient quantities, provides nourishment that promotes the growth of aquatic vegetation in the waters to such densities as to interfere with or be detrimental to their use by man or by any animal, fish or plant useful to man." MCL 323.231; MSA 3.533(301).

Section 2 of the act establishes the maximum limit of the nutrient phosphorus in cleaning agents at 8.7%.

---

[4] *Coffman v State Board of Examiners in Optometry,* 331 Mich 582, 590; 50 NW2d 322 (1951), quoting 42 Am Jur, § 26, p 316: "Administrative boards, commissions, and officers have no common-law powers. Their powers are limited by the statutes creating them to those conferred expressly or by necessary or fair implication."

"After July 1, 1972, a person shall not sell or distribute for use in this state a cleaning agent which contains phosphorus in any form *in excess* of 8.7% by weight expressed as elemental phosphorus." MCL 323.232; MSA 3.533(302) (emphasis added).

Section 3 delegates to the WRC the authority to enforce the act through promulgation of rules which may further restrict the nutrient content of cleaning agents. Section 3 states in pertinent part:

"The water resources commission shall promulgate rules in accordance with and subject to [the Administrative Procedures Act of 1969]. The rules may further restrict the nutrient content and other contents of cleaning agents and water conditioners, to prevent unlawful pollution and control nuisance growths of algae, weeds and slimes which are or may become injurious to other lawful water uses, to prevent cleaning agents and water conditioners, separately or in combination with other substances, from rendering or tending to render any waters of this state harmful or inimical to public health, or to animal or aquatic life, or to beneficial water uses, and to minimize any hazard to the health or safety of users of the cleaning agents or water conditioners." MCL 323.233; MSA 3.533(303).

And, finally, § 4 forbids the sale of detergents and cleaning agents containing those substances identified by the WRC as having a deleterious effect on water quality or human health. Phosphorus is excluded from this section, having already been legislatively designated as an unlawful pollutant in § 2. Section 4 reads:

"A person shall not sell detergents or cleaning compounds containing any substance other than phosphorus that may cause unlawful pollution of the waters when discharged thereto, if the water resources commission determines that the other substance will cause

unlawful pollution under the circumstances of its ex-. pected use and disposal or will pose a hazard to human health and safety." MCL 323.234; MSA 3.533(304).

The principal rule of statutory construction is that the Legislature intends the meaning that is clearly expressed;[5] an unambiguous statute does not need interpretation.[6] Equally fundamental is the rule that every word, sentence and section should be given effect if possible.[7]

Applying these principles, both the trial court and the Court of Appeals found that a plain reading of the statute revealed the legislative intent of allowing an administrative agency to "further restrict" the phosphorus content of cleaning agents. The trial court found it "clear" that the "in excess of 8.7%" language of § 2, read in conjunction with the authority to "further restrict the nutrient content" by rule in § 3, established a "ceiling", rather than a "floor" on phosphorus regulation. Additionally, the lower court found that § 3 delegated to the administrative agency the discretionary power to regulate phosphorus content of cleaning agents below the 8.7% ceiling. The Court of Appeals was even more explicit in its interpretation of the statute:

"The crucial words in this statute are 'further restrict the nutrient content of cleaning agents'.

\* \* \*

"The parties agree, and we concur, that phosphorus is

---

[5] *Dussia v Monroe County Employees Retirement System,* 386 Mich 244, 248-249; 191 NW2d 307 (1971); *MacQueen v City Comm of Port Huron,* 194 Mich 328, 342; 160 NW 627 (1916).

[6] *Bidwell v Whitaker,* 1 Mich 469, 479 (1850).

[7] *Grand Rapids v Crocker,* 219 Mich 178, 182; 189 NW 221 (1922); *Melia v Employment Security Comm,* 346 Mich 544, 562; 78 NW2d 273 (1956).

a nutrient. We also conclude that the word 'further' can have no meaning at all unless it applies to the right to alter the 8.7% limit on phosphorus. No other substance has yet been addressed by the Legislature, so no rule would have the effect of further restricting the nutrient content of a cleaning agent except for a rule regarding phosphorus. Moreover, since the phosphorus limit set by the Legislature was enacted simultaneously with the section permitting further restriction of nutrient content, the Legislature could have easily prohibited agency alteration of that limit. It did not do so, and we will not presume to imply such a prohibition." 103 Mich App 730.

We agree with this analysis.

However, even if the legislative intent were not as clear on the face of the statute as we feel it is, several rules of statutory interpretation would favor resolving ambiguity against legislative preemption.

First, this Court held in *Coffman v State Board of Examiners in Optometry,* 331 Mich 582; 50 NW2d 322 (1951), that when the Legislature establishes minimum standards by statute and entrusts enforcement of the statute to an agency, the agency is not precluded from setting higher standards. In *Coffman,* the statute required applicants for Michigan's optometry examinations to have completed at least two years in a certified school of optometry. The statute also granted the board of examiners the power to enact rules necessary for governing the practice of optometry, and pursuant to this authority the board adopted a rule requiring a four-year course in optometry. The court upheld the regulation stating:

"It does not follow that the board cannot, within reason, adopt higher standards than the minimum set up in the legislation." 331 Mich 591.

Likewise, in this case, the Legislature's minimum restriction that the phosphorus content in cleaning agents could not exceed 8.7% does not preclude the agency from promulgating more stringent requirements.

Second, or rather as a more general expression of the first rule, it is normally recognized that a remedial statute, such as the cleaning agents act, which attempts to protect the public health and general welfare, should be liberally construed. 3 Sands, Sutherland Statutory Construction (4th ed), § 65.03, p 163; 1 Cooper, State Administrative Law, p 263; *In re School Dist No 6, Paris & Wyoming Twps, Kent County,* 284 Mich 132, 144; 278 NW 792 (1938). This is especially true where the administrative agency is granted broad and comprehensive powers as in the case of the WRC. MCL 323.1 *et seq.;* MSA 3.521 *et seq.;* OAG, 1971-1972, No 4721, pp 53, 55-56 (June 7, 1971). See *White Lake Improvement Ass'n v City of Whitehall,* 22 Mich App 262; 177 NW2d 473 (1970). A broad construction of this statute would surely grant the agency the power to further restrict phosphorus content in cleaning agents.

Finally, not only do the plain reading of the statute and statutory rules of construction disfavor a finding of legislative pre-emption, but the Legislature itself, under a statutory duty to review the agency rule, MCL 24.245(1); MSA 3.560(145)(1), raised no objection to this delegation of power.[8]

---

[8] The Department of the Attorney General is likewise under a statutory duty to review agency rules and approve them if they are found to be legal, MCL 24.245(1); MSA 3.560(145)(1). Therefore, appellant manufacturer's argument that two informal memoranda by an assistant attorney general should be given "considerable weight" lacks merit. The two letters of the assistant attorney general interpret the cleaning agents act as precluding agency regulation of phosphorus. However, an agency attorney's informal letter does not authoritatively bind the agency. 1 Cooper, State Administrative Law, p 244; Davis, Administrative Law of the Seventies, § 21.08, p 480

In sum, we conclude that when the Legislature enacted the cleaning agents act it established minimum standards for the regulation of phosphorus in cleaning agents and delegated to an administrative agency the power to promulgate rules to regulate nutrients and other contents of cleaning agents as well as the power to establish more stringent standards for phosphorus regulation.

### III. THE GOVERNOR'S POWER UNDER CONST 1963, ART 5, § 2, AND THE EXECUTIVE ORGANIZATION ACT

A. *History*

The second challenge to the NRC's rule comes in the form of an attack on the Governor's authority to transfer powers between executive agencies. A full understanding of this challenge requires an examination of the history of art 5, § 2, of the 1963 Constitution and the Executive Organization Act of 1965, MCL 16.101 *et seq.;* MSA 3.29(1) *et seq.*

In 1963, the people of the State of Michigan adopted a new constitution which included an executive organization portion providing for the mandatory reorganization of the executive offices and agencies into no more than 20 principal departments. Article 5, § 2, provides:

"All executive and administrative offices, agencies and instrumentalities of the executive branch of state government and their respective functions, powers and duties, except for the office of governor and lieutenant governor and the governing bodies of institutions of higher education provided for in this constitution, shall

---

(1976); *Attorney General v Michigan Public Service Comm,* 412 Mich 385, 420; 316 NW2d 187 (1982). The Department of the Attorney General's approval of the legality of the rule is the dispositive binding opinion of that department.

be allocated by law among and within not more than 20
principal departments. They shall be grouped as far as
practicable according to major purposes."

The Legislature was given the authority to under-
take the initial reorganization. If the Legislature
failed to complete the reassignments in two years,
the Governor was given authority to make the
initial reorganization within one year thereafter.[9]

Subsequent to this initial reorganization, the
Governor was empowered to make further changes
through executive orders which could be disap-
proved by the Legislature. If not disapproved, the
executive orders would have the effect of law.
Article 5, § 2, provides:

"Subsequent to the initial allocation, the governor
may make changes in the organization of the executive
branch or in the assignment of functions among its
units which he considers necessary for efficient adminis-
tration. Where these changes require the force of law,
they shall be set forth in executive orders and submit-
ted to the legislature. Thereafter the legislature shall
have 60 calendar days of a regular session, or a full
regular session if of shorter duration, to disapprove
each executive order. Unless disapproved in both houses
by a resolution concurred in by a majority of the
members elected to and serving in each house, each
order shall become effective at a date thereafter to be
designated by the governor."

The constitutional provision of art 5, § 2, was
given effect in 1965 when the Legislature enacted

_____
[9] Const 1963, Schedule and Temporary Provisions, § 12:
"The initial allocation of departments by law pursuant to Section 2
of Article V of this constitution, shall be completed within two years
after the effective date of this constitution. If such allocation shall not
have been completed within such period, the governor, within one
year thereafter, by executive order, shall make the initial allocation."

the Executive Organization Act, MCL 16.101 *et seq.;* MSA 3.29(1) *et seq.* The act established 19 principal departments and made the initial allocation of functions among the departments.

The Governor was, therefore, never required to undertake the allocation of his powers. However, on various occasions, the Governor has utilized his power to issue executive reorganization orders.

The executive orders at issue in this case are Executive Orders Nos. 1973-2, 1973-2a and 1976-8. Executive Order No. 1973-2 transferred the "statutory authority, powers, duties, functions, and responsibilities" of the WRC to the DNR. This order was amended by Executive Order 1973-2a to exclude certain powers from transfer. Finally, Executive Order No. 1976-8 repeated Executive Order No. 1973-2a and reaffirmed the transfer to the DNR, again with certain exceptions.

The appellant manufacturers attack these executive orders on the ground that the constitutional provision, art 5, § 2, pursuant to which the Governor acted, did not grant the authority to transfer agency rulemaking power.

B. *Changes in the Organization of the Executive Branch*

Appellants introduce their argument that the Governor has no authority to transfer the rulemaking power between agencies as follows:

" 'Subsequent to the initial allocation, the governor may make changes in the *organization* of the executive branch or in the *assignment* of *functions* among its units which he considers *necessary for efficient administration.'* Const 1963, art 5, § 2 (emphasis added).

"A transfer of rulemaking power obviously is not a change in organization; nor is it an assignment of functions for 'efficient administration.' " "

The simple declaration that "[a] transfer of rule-making power obviously is not a change in organization" is a facile assumption that overlooks stubborn reality. The fact of the matter is that organization comprises at least two elements: 1) the division of personnel, and 2) the division of powers among such personnel. To say that a transfer of personnel to exercise a different power is a change of organization but that a transfer of a power to be exercised by different personnel is not a change of organization is to be oblivious to reality and to torture the concept of "changes in the organization". What president of a corporation who originally had the power of chief executive officer would not recognize that there was a change in corporate organization if the corporate board transferred that power from him to the chairman of the board? So too we would not hold that a transfer of rulemaking power from one executive segment of government to another executive segment of government was not a change "in the organization of the executive branch".

We find that a transfer of rulemaking power is indeed a change "in the organization of the executive branch".

## C. *Assignment of Function*

Since we could not agree with appellants' observation that "[a] transfer of rulemaking power obviously is not a change in organization", it is decisionally unnecessary for us to consider their interpretation of "assignment of functions". However, particularly since this is their only real effort at argument relative to Const 1963, art 5, § 2, we will consider their arguments on "assignment of functions". The argument focuses on the variation in language between ¶¶ 1 and 2 of Const 1963, art 5, § 2.

Paragraph 1 authorized the allocation of the respective "functions, powers and duties" of the agencies within the newly created departments. Under ¶ 2 the Governor is authorized to assign "functions * * * necessary for efficient administration".

Appellants thereafter argue that Executive Orders Nos. 1973-2a and 1976-8 which attempt to reassign "powers", especially the power of rulemaking, are beyond the second alternate authority granted to the Governor in art 5, § 2.

However, this interpretation of art 5, § 2, eviscerates the intention of the constitutional convention in including this provision in the constitution, and of the Legislature in their enactment of the Executive Organization Act.

### 1. *Rules of Constitutional Construction*

In interpreting the constitution, this Court has developed two rules of construction. First, the interpretation given the constitution should be "the sense most obvious to the common understanding"; the one which "reasonable minds, the great mass of people themselves, would give it". *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971); *Council No 11, AFSCME v Civil Service Comm,* 408 Mich 385, 405; 292 NW2d 442 (1980) (quoting Cooley's Const Lim [6th ed], p 81). Secondly, "the circumstances surrounding the adoption of the constitutional provision and the purpose sought to be accomplished may be considered". *Traverse City School Dist,* 384 Mich 405. See *Kearney v Board of State Auditors,* 189 Mich 666, 673; 155 NW 510 (1915).

### (a) *Circumstances Surrounding Adoption*

The record of the constitutional convention indicates that the convention's purpose in including art 5, § 2, was to facilitate economy and efficiency

in the executive agencies. 2 Official Record, Constitutional Convention 1961, p 1847 (comments of Mr. Pollock); p 1836 (comments of Mr. Martin); p 1837 (comments of Mr. Bentley). The convention felt that the Legislature previously had failed to effectuate a reorganization itself, and that the Governor was in the best position to accomplish the desired ends, having intimate knowledge of the problems. 2 Official Record, Constitutional Convention 1961, p 1846 (comment of Mr. Pollock). The convention recognized that the reorganization power granted the Governor in ¶ 2 of art 5, § 2, was *clearly legislative.* 2 Official Record, Constitutional Convention 1961, p 1846 (comments of Mr. Heideman and Mr. Hutchinson).[10] Nonetheless, the

[10] The nature and extent of the power granted to the Governor in art 5, § 2, was most thoroughly discussed by the convention in the context of what restraints should be placed upon the Governor's exercise of the power. At one point an amendment was proposed to allow an executive organization plan submitted under ¶ 2 to be disapproved by a majority vote of either house. The following comments were made during a discussion of this amendment.

*"Mr. Heideman:* I would like to speak in favor of this amendment. If I were a poet, I would write a poem on our pale, poor, abused legislature. One day we give the powers to the supreme court; *on another day we give the powers to the governor;* on still another day, we give legislative powers to civil service; on another, to a quasi legislative or judicial body or commission. One day the Democrats kick the legislature; on another day the Republicans do the same. There is a seeming bipartisan approach to this, a cooperation, as it were, here at the constitutional convention, to cut down or whittle away the powers of the legislature.

\* \* \*

*"Mr. Hutchinson:* \* \* \* With that I take issue and would argue this way: under this arrangement you are turning the traditional system upside down, to begin with. Instead of giving to the legislature the lawmaking function in these reorganization plans, and to the governor a veto, *you are giving to the governor, in effect, the power to make the law and you are according to the legislature a veto."* 2 Official Record, Constitutional Convention 1961, p 1846 (emphasis added).

In view of the convention's recognition that the Governor was being granted broad legislative power, subject to legislative veto, appellants' argument that that power granted to the Governor in art 5, § 2, ¶ 2, is different in kind from legislative power of ¶ 1 is simply mistaken.

delegates chose to include this delegation to the Governor in the constitution, subject to vigorously debated checks deemed necessary to restrain the broad grant of power. 2 Official Record, Constitutional Convention 1961, pp 1843-1854.

Therefore, appellant manufacturers' reading of the constitutional section clearly defeats the convention's purpose which was to grant the Governor full legislative power to promote the most efficient possible executive department. Recognition of the broad powers of reorganization granted is found in the provisions for legislative veto of the Governor's reorganization executive orders, not in a diminution of power granted to the Governor.

(b) *Common Understanding Rule*

Secondly, appellant manufacturers' restrictive interpretation of "function" in ¶ 2 distorts the commonly perceived meaning of the word. Though the words "function" and "power" have clear semantic differences and might even have different legal import (though neither the parties' briefs nor our own research disclose any Michigan court's interpretation of the words), the common understanding of the terms an agency's "function" and an agency's "power" must surely be only variations on a theme. Of what use is it to allow the transfer of a function, but leave the power to perform the function behind? And what becomes of the disembodied "power" with no "function" to channel its exercise? In the broad scheme of reorganizing the agencies of the executive branch of the government, what conceivable good can be accomplished by allowing for the transfer of one without the other? We have no doubt that the plain reading of the constitution would indicate to the common understanding that the term "function" inherently includes the accompanying

"power" necessary to give life and substance to the "function".

2. *The Executive Organization Act*

Further support for the logic of this interpretation of the constitution is found in the Executive Organization Act. In *McDonald v Schnipke,* 380 Mich 14, 26; 155 NW2d 169 (1968), this Court held that art 5, § 2, of the constitution was not self-executing, but that the Executive Organization Act served as the enabling act of that provision.[11]

The Executive Organization Act establishes 19 principal departments. The act also provides a general mechanism for placing existing agencies into the framework of the 19 principal departments. Three types of transfers could be effectuated. Under a Type I transfer, an agency is merely identified as being within a particular department; the agency continues to perform its functions as prescribed by statute.[12] Under a Type II assign-

[11] The appellant manufacturers argued that the Court of Appeals reliance on the Executive Organization Act to interpret the constitutional provision was erroneous, citing *White v Ann Arbor,* 406 Mich 554; 281 NW2d 283 (1979). However, *White* is inapposite. In that case the parties sought to use a later, unrelated legislative enactment using the words "public utility" to interpret the same phrase in the constitution. In this case, the Executive Organization Act is addressing not only the identical problem discussed in the constitutional provision, but the *Schnipke* case held that the act was the legislation which implemented the constitution. The Court of Appeals, therefore, correctly found the Executive Organization Act relevant to interpreting Const 1963, art 5, § 2. 103 Mich App 728.

[12] MCL 16.103(a); MSA 3.29(3)(a) provides:

"Under this act, a type I transfer means the transferring intact of an existing department, board, commission or agency to a principal department established by this act. When any board, commission, or other agency is transferred to a principal department under a type I transfer, that board, commission or agency shall be administered under the supervision of that principal department. Any board, commission or other agency granted a type I transfer shall exercise its prescribed statutory powers, duties and functions of rule-making, licensing and registration including the prescription of rules, rates, regulations and standards, and adjudication independently of the head of the department. Under a type I transfer all budgeting, procurement and related management functions of any transferred

ment, the agency loses autonomous control of its functions—"all its statutory authority, powers, duties and functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and procurement [are] transferred to that principal department".[13] Under a Type III transfer, the agency is abolished. MCL 16.103(c); MSA 3.29(3)(c).

Finally, the act delineates the relationship between the transferred agency and the principal department which acquires the agency. MCL 16.107; MSA 3.29(7). Under subsection (a), the department head is given the power to allocate functions among his agencies with the approval of the Governor, in order to promote economy and efficiency. Substantive functions, vested by law in an agency or officer, however, shall not be removed from that agency or officer, under this section.

However, if a Type II or III transfer is involved, the department head has greater authority. Subsection (b) provides:

"Except as provided by law or within this act, when any department, commission or board or other agency is transferred by a type II or type III transfer to a principal department under the provisions of this act, the functions of the department, commission or board or other agency shall be administered under the direc-

board, agency or commission shall be performed under the direction and supervision of the head of the principal department."

[13] MCL 16.103(b); MSA 3.29(3)(b) provides:

"Under this act, a type II transfer means transferring of an existing department, board, commission or agency to a principal department established by this act. Any department, board, commission or agency assigned to a type II transfer under this act shall have all its statutory authority, powers, duties and functions, records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and procurement, transferred to that principal department."

tion and supervision of the head of the principal department. When a department, commission, board or other agency is transferred by a type II or type III transfer to a principal department all prescribed statutory functions of rule making, licensing and registration including the prescription of rules, regulations, standards and adjudications shall be transferred to the head of the principal department into which the department, commission, board or agency has been incorporated." MCL 16.107(b); MSA 3.29(7)(b).

This section carefully defines the agency "functions" over which the department head may exercise control to include "all prescribed *statutory functions* of *rule making,* licensing and registration *including the prescription of rules, regulations, standards"* (emphasis added).

Clearly the Legislature considered "powers" subsumed within the broader category of "functions".

No specific considerations are provided in the Executive Organization Act for the art 5, § 2, activities—the subsequent reallocations by the Governor. Yet in *McDonald* this Court held that the act was the implementing legislation for the constitutional section. The fair implication of this interpretation is that the Governor, in exercising his powers, should use the transfer mechanism established in the Executive Organization Act, *i.e.,* the provisions regarding Type I through Type III transfers and the relationship between the departments and the transferred agencies.

This is in fact the mechanism and terminology that has been used by the Governor in his executive orders. See, *e.g.,* Executive Reorganization Order No. 1971-1 (Type II transfer of the Economic Opportunity Office from the Executive Office of the Governor to the Department of Labor); Executive Reorganization Order No. 1971-2 (Type II transfer of the Building Division of the Bureau of Budget

from the Executive Office of the Governor to the Department of Administration); Executive Reorganization Order No. 1972-2 (Type II transfer of the Corporation Division and the Corporation Franchise Fee Division from the Department of Treasury to the Department of Commerce). Thus, rulemaking power has repeatedly been transferred by the Governor, as a "function", within the scope of art 5, § 2.

## D. *Separation of Powers*

Finally, appellant manufacturers argue that the broad legislative power to reorganize the executive department's bureaucratic maze could not have been intended since it violates the doctrine of separation of powers by commingling executive and legislative functions within one branch of the government. This argument fails to understand the fundamental purpose of the doctrine of separation of powers.

The doctrine of separation of powers is generally attributed to Montesquieu[14] who pinpointed the fault with the vesting of both legislative and executive functions in one branch of the government.

"When the legislative and executive powers are united in the same person or body * * * there can be no liberty; because *apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."* (Emphasis added.)

Madison, in The Federalist No. 47, clarifies Montesquieu, explaining that he did not mean there could be no overlapping of functions between branches, or no control over the acts of the other. Rather,

---

[14] The Federalist No. 47 (J. Madison).

"[h]is meaning * * * can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted." The Federalist No. 47 (J. Madison).

These principles have been adopted in Michigan. Thus, while art 3, § 2, of the constitution provides for strict separation of power,[15] this has not been interpreted to mean that the branches must be kept wholly separate. *People v Piasecki,* 333 Mich 122, 146; 52 NW2d 626 (1952); *In re Southard,* 298 Mich 75, 83; 298 NW 457 (1941). Additionally, where, as in art 5, § 2, the constitution explicitly grants powers of one branch to another, there can be no separation of powers problem. *Wood v State Administrative Board,* 255 Mich 220, 224-225; 238 NW 16 (1931).

Article 5, § 2, does not by any means vest "all" or any considerable legislative power in the executive. While it is true that broad legislative power has been delegated to the Governor to effectuate executive reorganization, this power is clearly limited. Three limitations must be emphasized. First, the area of executive exercise of legislative power is very limited and specific. Second, the executive branch is not the sole possessor of this power; the Legislature has concurrent power to transfer functions and powers of the executive agencies. Third, the Legislature is specifically granted the power to veto executive reorganization orders before they become law.

Therefore, the specific intent of the constitutional convention in fashioning art 5, § 2, having

---

[15] State governments are not constitutionally required to adhere to the doctrine of separation of powers. *Sweezy v New Hampshire,* 354 US 234, 255; 77 S Ct 1203; 1 L Ed 2d 1311 (1957).

been to delegate a very limited and specific legislative power to the executive, and this provision having been adopted into the constitution with sufficient checks to restrain an improper exercise of this power, we find no constitutional infirmity negating the Governor's ability to transfer rulemaking authority from one agency to that agency's department head.

## IV. EXECUTIVE TRANSFER OF RULEMAKING TO NRC

We have so far found: (1) that the Legislature did not pre-empt the power to restrict the allowable percentage of nutrient phosphorus content in cleaning agents but specifically authorized the WRC to "further restrict the nutrient content * * * of cleaning agents" by rule; (2) that the Governor had the authority to transfer the rulemaking power between executive agencies under constitutional and statutory executive reorganization powers. We come therefore to the third consideration, and that is whether Executive Order No. 1976-8 does in fact and in law transfer to the NRC the power to "further restrict the nutrient content * * * of cleaning agents" by rule.

As the appellant manufacturers stated in their brief, "The NRC purported to promulgate the rule under the cleaning agents act. Section 2 of the act imposed legislative limitations for the first time on the content in cleaning agents of one nutrient, phosphorus * * *. The act also delegated to the Water Resources Commission * * * the authority to 'further restrict the nutrient content and other content of cleaning agents' * * *. No authority was delegated to the NRC by the act". This statement indicates agreement that under the cleaning agents act the WRC had the authority to "further

restrict the nutrient content and other content of
cleaning agents" and that the issue in the instant
case is whether the authority to "further restrict
the nutrient content and other content of cleaning
agents" provided in the cleaning agents act was
transferred from the WRC to the NRC by Execu-
tive Order No. 1976-8.

"Appellants submit that the Court of Appeals
completely misconstrued the terms and purpose of
the executive order and ignored, without explana-
tion, the Governor's own independently expressed
interpretations of it." With this statement the
appellants introduce their argument construing
Executive Order No. 1976-8 "that the Governor
intended to reserve the WRC's rulemaking powers
under the cleaning agents act * * * to the WRC".
Thereafter, the appellants argue that the Execu-
tive Order No. 1976-8 must be interpreted in light
of (1) a letter from the Governor to appellants'
counsel stating the Water Resources Commission
"will retain the essential adjudicative and rule
making functions", (2) a DNR news bulletin piece
stating "[h]owever, the commissions retain their
responsibilities for * * * adopting rules as re-
quired under their legislative mandates, Governor
Milliken states", and (3) a statement relative to his
1976 executive order in the Governor's 1978 State
of the State Message as follows: "I will recommend
that all permit issuing, regulatory, and quasi-judi-
cial functions of the commissions be transferred to
the department". Appellants claim these docu-
ments demonstrate that the executive order re-
served transfer of the power to "further restrict
the nutrient content * * * of cleaning agents" to
the WRC. The appellants refer to no authority or
rule of law permitting reliance on these extrinsic

documents to aid in the interpretation of the executive order.

Appellees counter: (1) how can it be argued that the Governor and the Attorney General, defendants in this case, opposed the nutrient content rule, as contrary to their intentions and wishes in Executive Order No. 1976-8, when they both approved the promulgation of the rule under the Administrative Procedures Act of 1969, MCL 24.245, subds (1), (2), and 24.246, subd (1); MSA 3.560(145), subds (1), (2), and 3.560(146), subd (1); (2) the Governor's executive order is the authoritative statement of the Governor as to what the order meant, not his correspondence or message; likewise, the DNR's authoritative statement is the rule, not a press release, and the Attorney General's authoritative statement is his official approval of the rule, not an informal memo of an assistant attorney general; (3) "the language of Executive Order No. 1976-8 is unambiguous; consequently no need arises to resort to consideration of the meaning intended"; and (4) there is good policy reason for not reserving the power to "further restrict the nutrient content * * * of cleaning agents" to the WRC which is composed of four civil servants and three representatives of special interests rather than to the NRC whose membership represents the general public and is subject to Senate confirmation and removal for cause by the Governor. Appellees ground only one of their four arguments on cited legal authority.[16] That authority relates to rules for statutory construction, not construction of executive orders.

---

[16] "See *Detroit v Redford Twp,* 253 Mich 453, 455; 235 NW 217 (1931); *Scholten v Rhoades,* 67 Mich App 736, 745; 242 NW2d 509 (1976)."

We understand the lack of direct authority in the briefs on construction or interpretation of executive orders, because we found little ourselves. However, two rules relating to administrative regulations, which stand in the same position as executive orders, appear in the following quotation of the United States Supreme Court in *Udall v Tallman,* 380 US 1, 16-17; 85 S Ct 792; 13 L Ed 2d 616 (1964), which quoted with approval from a previous decision of that Court:

" 'Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt * * *. [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' *Bowles v Seminole Rock Co,* 325 US 410, 413-414 [65 S Ct 1215; 89 L Ed 1700 (1945)]."

The first rule by negative implication is that interpretation is not warranted unless "the meaning of the words used is in doubt". The second rule, of course, is that in case of doubt administrative interpretation is the "ultimate criterion".

Furthermore, in the *Udall* case, the United States Supreme Court, at least as far as administrative agency interpretation was concerned, seemed to apply the same rules of construction to *statutes* and *administrative regulations.* Specifically, the Court cited a number of statutory interpretation cases and then continued:

"When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." 380 US 16.

The use of the same rules of construction for both

statutes and executive orders or administrative regulations is not illogical because executive orders and administrative regulations are both quasi-legislative in nature. See 1 Sands, Sutherland Statutory Construction, p 219; J. Asselin, *Executive Orders: Discretion vs Accountability,* 51 Conn Bar J 383 (1977).

With these premises, we believe it is in order to apply the following rules to construing Executive Order No. 1976-8:

1. The executive intends the meaning that is clearly expressed; an unambiguous executive order does not need interpretation.

2. A corollary of rule 1 is that every word, sentence and section should be given effect, if possible.

3. If the meaning of an executive order is in doubt, the interpretation given by the agency administering it is persuasive as to the meaning of the order "unless it is plainly erroneous or inconsistent with the" order.

We proceed to an examination of the executive order. Executive Order No. 1976-8 in pertinent part reads as follows:

"*The statutory authority, powers, duties, functions and responsibilities of the Water Resources Commission* created under Section 1, Act 245, P.A. 1929, as amended, being Section 323.1 of the Compiled Laws of 1948, *are hereby transferred to the Department of Natural Resources by a Type II transfer* as defined by Section 3(b) of Act 380 of the Public Acts of 1965, *except that* the Water Resources Commission shall continue to exercise independent authority with respect to quasi-judicial functions, rule-making, and issuance of permits and orders in the water pollution control functions, as specified in Section 2, Section 5, subsection (1) of Section 7, and subsection (b) of Section 8 of Act No. 245 of the Public Acts of 1929, as amended. In all other

areas it shall serve in an advisory capacity to the
Natural Resources Commission and staff." (Emphasis
added.)

Before determining whether this order trans-
ferred to the NRC the power to set by rule nu-
trient content in cleaning agents, it is well to first
note that there are three principal and critical
parts to the order. The transfer to the NRC is:

1. of "[t]he statutory authority, powers, duties,
functions and responsibilities of the Water Re-
sources Commission created under Section 1, Act
245, P.A. 1929, as amended";

2. "by a Type II transfer as defined by Section 3(b)
of Act 380 of the Public Acts of 1965";

3. *except that* the Water Resources Commission
shall continue to exercise independent authority
with respect to quasi-judicial functions, rule-mak-
ing, and issuance of permits and orders in the
water pollution control functions, as specified in
Section 2, Section 5, subsection (1) of Section 7,
and subsection (b) of Section 8 of Act No. 245 of
the Public Acts of 1929, as amended".

We conclude from examination individually of
each of the three parts of Executive Order No.
1976-8 and examination of all three parts together
that the executive order clearly transfers to the
NRC the power to "further restrict the nutrient
content * * * of cleaning agents" by rule without
any ambiguity.

The first part of the order sets forth what is to
be transferred both specifically and with complete-
ness. The language is: "[t]he statutory authority,
powers, duties, functions and responsibilities of the
Water Resources Commission created under Sec-
tion 1, Act 245, P.A. 1929, as amended". The WRC,
as already noted in Part II of this opinion, and, as

referred to in appellant manufacturer's statement, had the power by authority of § 3 of 1971 PA 226, the cleaning agents act, to "promulgate rules [to] further restrict the nutrient content". Therefore it is clear beyond peradventure that the language "[t]he statutory authority, powers, duties, functions and responsibilities of the Water Resources Commission" transfers to the NRC the authority in question, *i.e.,* to "further restrict [by rule] the nutrient content * * * of cleaning agents.

We note in passing that the reference to the WRC act is exclusively *"created* under Section 1, Act 245, P.A. 1929, as amended". Section 1 of the act merely *creates* the commission, naming the membership, etc. Consequently, reference to § 1 of 1929 PA 245 only identifies the commission with specificity. It in no way describes or delimits the transferred powers to those powers created by 1929 PA 245. Thus if the WRC has powers by virtue of any other act, those powers too are transferred to the NRC. We will see that this is in contrast to the powers reserved or excepted in the third part of the order which are pinned down to those created by specific sections of 1929 PA 245, as amended. So thus far it is clear that the executive order transfers to the NRC the power in question in this case.

The second part of the order emphasizes that the basic powers of WRC are being transferred to the NRC. The transfer is "by a Type II transfer as defined by Section 3(b) of Act 380 of the Public Acts of 1965". As we noted in Part III of this opinion, "Under a Type II assignment, the agency loses autonomous control of its functions—'all its statutory authority, powers, duties and functions * * * [are] transferred to that principal department' ". In other words, it is clear beyond

ambiguity that a Type II transfer transferred all the WRC's rulemaking powers including those under the cleaning agents act to the NRC. In fact, that is what a Type II transfer was created to do.

The third part of the order consequently becomes crucial since there is no doubt that the first two parts transfer the WRC powers including the power at issue to the NRC. The ultimate and dispositive question therefore becomes whether from all that was transferred from the WRC to the NRC the power at issue was excepted.

Again the executive order is very clear and specific:

> *"except that* the Water Resources Commission shall continue to exercise independent authority with respect to quasi-judicial functions, rule-making, and issuance of permits and orders in the water pollution control functions, *as specified* in Section 2, Section 5, subsection (1) of Section 7, and subsection (b) of Section 8 of Act No. 245 of the Public Acts of 1929, as amended." (Emphasis added for "as specified".)

We will bypass the argument between appellant manufacturers and the opinion of the Court of Appeals whether "the Act 245 powers reserved to the WRC in the executive order concerned only the limited area of 'waste discharge' " because we believe there is a clearer, simpler argument and that this argument is dispositive.[17]

---

[17] While we believe it is preferable and clearer to decide whether the power to "further restrict nutrient content" was reserved by the analysis that none of the named sections of 1929 PA 245 is now the repository of that power, we have examined and reflected on the difference of opinion between appellant manufacturers and the Court of Appeals. We are not persuaded on analysis of the four pertinent sections of 1929 PA 245 that they pertain to the regulation of content of cleaning agents. As appellants quote on page 11 of their brief: "Section 2 of Act 245 directs the WRC to 'promulgate *such rules* as may be deemed necessary to carry out this act.' " "This act" does refer to "waste disposal" (see § 2 itself, § 5, § 7[1] and § 8) but nowhere

This Court is of the opinion that it is clear on the face of the executive order: (1) that, as already indicated in this opinion's analysis, the Governor's order transferred all of the WRC's powers, whatsoever, among others the power to "further restrict nutrient * * * content" as provided in 1971 PA 226, the cleaning agents act; (2) that the reserved or excepted powers, however, are only those powers, as stated in the executive order, "as specified in Section 2, Section 5, subsection (1) of Section 7, and subsection (b) of Section 8 of Act No. 245 of the Public Acts of 1929, as amended"; (3) that the power to "further restrict the nutrient content of · * * * cleaning agents", the power in question, is found in 1971 PA 226, the cleaning agents act, and not in any of the aforesaid sections of 1929 PA 245, reserved to the WRC; and (4) therefore, since the exception clause does not except the 1971 PA 226 power to "further restrict the nutrient content * * * of cleaning agents", which was granted in the transferring clause, that power to "further restrict" is duly transferred to and is a part of the powers of the NRC. In short, Executive Order No. 1976-8 transferred to the NRC the power to pro-

refers to nutrient content of cleaning agents. In general, 1929 PA 245 appears designed to limit the discharge into state waters rather than prescribing the characteristics of materials. Appellants state: "Similarly Section 5 of Act 245 grants the WRC power to 'make rules and orders restricting the polluting content of any waste material or polluting substance' [e.g., cleaning agents]". This comes closest to prescribing the characteristics of materials. But appellants failed to include the rest of the sentence: "waste material or polluting substance discharged or sought to be discharged into any lake, river, stream, or other waters of the state". In other words, the objective was to control directly the discharge into state waters. Whether or not the appellants believe that this would have permitted the WRC to limit the nutrient content in cleaning agents, the matter was sufficiently unclear that the Legislature saw fit to enact the cleaning agents act. In short, while an argument could be made that 1929 PA 245 was directed toward controlling waste disposal, it is certainly difficult to argue that it contemplated restricting nutrient content in cleaning agents, even before the passage of the cleaning agents act.

mulgate the rule to which appellant manufacturers object. This, in effect, decides this case.

What the specified sections of 1929 PA 245 do contain, to use appellants' descriptions most favorable to them follow:

"Section 2 of Act 245 directs the WRC to 'promulgate *such rules* as may be deemed necessary to carry out this act.' MCL 323.2; MSA 3.522 (emphasis added). Similarly, Section 5 of Act 245 grants the WRC power to '*make rules and orders* restricting the polluting content of any waste material or polluting substance *[e.g.,* cleaning agents] * * *.' MCL 323.5; MSA 3.525 (emphasis added). Section 8(b) concerns *permit issuance* and Section 7(1) concerns *adjudication.*" (Emphasis in original.)

Whatever these sections include, they obviously do not include the cleaning agents act, or its pertinent § 3.

Appellant manufacturers argue in the above-quoted paragraph, however, that "Section 5 of Act 245 grants the WRC power to *make rules and orders* restricting the polluting content of any waste material or polluting substance" and that consequently the WRC under act 245 can control the nutrient content of cleaning agents. This argument is immaterial. Even if appellants were correct in their interpretation that the Legislature intended to include cleaning agents in the terms "waste material" or "polluting substance" as used in § 5 of 1929 PA 245, that would have no effect whatsoever on the transfer of the power to the NRC, which is the basis of their promulgating 1979 AC, R 323.1173, because the basis of promulgating that rule is 1971 PA 226, § 3, not 1929 PA 245, § 5.

It might be argued that the executive order

reserved to the WRC a concurrent power to "further restrict the nutrient content * * * of cleaning agents" because of § 5 of 1929 PA 245. However, the value of such an argument at this point is highly speculative for a number of reasons, even conceding that § 5 of 1929 PA 245 provides such power. First, we are not concerned here with whether the WRC has such power. Second, the WRC has not exercised such power. Third, the ability of the WRC to effectively exercise such power in the face of the present executive organization and specific legislative grant of authority in § 3 of 1971 PA 226 is highly problematical. In any event, the decisive consideration is that even if the WRC had concurrent power, that does not affect the NRC's power, and that is the question before us.

We believe that three features of the executive order make it clear and unambiguous that the power in question was transferred to the NRC and not reserved to the WRC. First, the litany of powers transferred is universal. Second, the use of a Type II fundamental and comprehensive transfer indicates the Governor's intention to transfer all basic powers. Third, the limited reservation is particularly apparent in the significant contrast, on the one hand, in the first granting reference to 1929 PA 245, § 1 creating the WRC indicating that the litany of powers was inclusive of all those possessed by the WRC wherever found, and, on the other hand, to the second reserving reference to the particular specified sections of 1929 PA 245, none of which included the power to "further restrict the nutrient content * * * of cleaning agents" as that power is found in 1971 PA 226.

We must conclude that having in mind the comprehensive task of transfer and reservation,

Executive Order No. 1976-8 is certainly unambiguous and more than sufficiently clear to those whose job it is to work with it. In short, we believe we are justified in stating that the order is clear and unambiguous.

However, if the language is considered doubtful, then our rules of construction would require us to apply the rule of deference to the administrative construction. The NRC in issuing the rule in question has obviously interpreted Executive Order No. 1976-8 to transfer to it the necessary rulemaking power. As noted by appellees, this interpretation has also been agreed with by the Governor, who promulgated the order in the first place, and by the Attorney General, the chief executive law officer. It would appear that the executive department was unanimous in this interpretation, because the WRC which might also be concerned has not contested the interpretation or attempted to exercise the power itself as far as the record reveals. Finally, while the Legislature would have no input as to what the Governor intended in his order, its approval of the rule must signify its belief in its legality as well as public policy.

If the language of Executive Order No. 1976-8 were really in doubt, or if there was not strong authority to rely on the administrative agency's interpretation, and if the administrative agency's and general executive position were not so clear, then it might be profitable to refer to the extrinsic, informal material relied on by appellees for whatever their merits warranted. However, under the existing circumstances such reference is not justifiable.

## CONCLUSION

We hold: (1) that § 3 of 1971 PA 226 makes it

very clear that the Legislature did not intend to pre-empt, and did not pre-empt, the power to "further restrict the nutrient content * * * of cleaning agents", but placed it in the WRC; (2) that Const 1963, art 5, § 2, and the Executive Organization Act granted the Governor the authority to transfer powers between executive agencies; and (3) that Executive Order No. 1976-8 transferred to the NRC the power to promulgate 1979 AC, R 323.1173(4). As a consequence, the Court of Appeals and the trial court are affirmed. No costs, a public question being involved.

FITZGERALD, C.J., and KAVANAGH and RYAN, JJ., concurred with WILLIAMS, J.

LEVIN, J. *(dissenting).* The executive order transferred to the Department of Natural Resources the statutory authority, powers, duties, functions and responsibilities of the Water Resources Commission created under § 1, 1929 PA 245, as amended, MCL 323.1; MSA 3.521. Section 1 provides for the establishment of the Water Resources Commission and for the appointment of its members. The executive order excepts rule-making and certain other functions under §§ 2 and 5, subsection 1 of § 7, and subsection (b) of § 8 of act 245, as amended, thereby indicating that it was intended to transfer all powers and duties with the exceptions indicated.[1]

---

[1] The challenged executive order, Executive Order No. 1976-8, reads in pertinent part as follows:

"1. Executive Order 1973-2a is hereby repealed and this order shall supersede the provisions of that order.

"2. Executive Order 1973-2 shall remain in full force and effect as amended in the following manner:

"a. Paragraph 2, page 1, as amended, reads as follows:

"The statutory authority, powers, duties, functions and responsibilities of the Water Resources Commission created under Section 1, Act 245, P.A. 1929, as amended, being Section 323.1 of the Compiled Laws

The DNR justifies the regulation being challenged on the basis that it was thus the intent of

of 1948, are hereby transferred to the Department of Natural Resources by a Type II transfer as defined by Section 3(b) of Act 380 of the Public Acts of 1965, *except that* the Water Resources Commission shall continue to exercise independent authority with respect to quasi-judicial functions, rule-making, and issuance of permits and orders in the water pollution control functions, as specified in Section 2, Section 5, subsection (1) of Section 7, and subsection (b) of Section 8 of Act No. 245 of the Public Acts of 1929, as amended. In all other areas it shall serve in an advisory capacity to the Natural Resources Commission and staff."

Executive Order No. 1973-2a reads in pertinent part as follows:

"1. All of paragraph 2, page 2, of said executive order [1973-2] is stricken and in lieu thereof the following is hereby ordered:

" '2. The statutory authority, powers, duties, functions, responsibilities of the Water Resources Commission created under Section 1, Act 245, P.A. 1929, as amended, being Section 323.1 of the Compiled Laws of 1948, are hereby transferred to the Department of Natural Resources by a Type II transfer as defined by Section 3(b) of Act 380 of the Public Acts of 1965, *except that* the following powers, duties and responsibilities specifically related to that function shall be exercised by the Water Resources Commission independent of the Department of Natural Resources.

"a. Sections 2-6, 6(a), 6(b), 7-9 and 13 of Act 245, P.A. 1929 as amended; Sections 4, 8, and 10 of Act 167, P.A. 1970; Sections 4 and 5 of Act 211, P.A. 1956, as amended; Sections 3-5, 7, 10, 12, 14-17 of Act 329, P.A. 1966, as amended; Section 3 of Act 222, P.A. 1966; Sections 4, 5, 7, 11, 13, 14 and 15 of Act 347, P.A. 1972; and Section 423 of Act 40, P.A. 1956, as amended, by Act 298, P.A. 1972.

"b. The Water Resources Commission shall continue to exercise independent authority with respect to quasi-judicial functions in the rule-making, enforcement, and issuance of orders in the water pollution control functions. In all other areas it shall serve in an advisory capacity to the Natural Resources Commission and staff.

"c. All records, property, personnel and unexpended balances of appropriations and allocations and other funds used, held, employed, available, or to be made available to the Water Resources Commission are transferred to the Department of Natural Resources.' "

Executive Order No. 1973-2 reads in pertinent part as follows:

"2. The statutory authority, powers, duties, functions, and responsibilities of the Water Resources Commission created under Section 1, Act 245 of Public Acts of 1929, as amended, being section 323.1 of the Compiled Laws of 1948, are hereby transferred to the Department of Natural Resources by a Type II transfer as defined by Section 3(b) of Act 380 of the Public Acts of 1965.

"a. The Water Resources Commission shall serve in an advisory capacity to the Natural Resources Commission and staff.

"b. All records, property, personnel and unexpended balances of appropriations and allocations and other funds used, held, employed,

the executive order to transfer to the DNR the Water Resources Commission's authority under the cleaning agent act, 1971 PA 226, MCL 323.231; MSA 3.533(301), a separate act not adverted to in the executive order.

There is in our opinion an ambiguity whether it was intended to retain in the Water Resources Commission the rule-making functions under the cleaning agent act so retained in respect to the general enabling act, act 245. The Governor's letter of October 6, 1976[2] and the DNR announce-

available, or to be made available, to the Water Resources Commission are transferred to the Department of Natural Resources."

Executive Order No. 1973-2 was promulgated January 11, 1973, to become effective April 1, 1973. Executive Order No. 1973-2a was promulgated March 13, 1973, to become effective May 14, 1973. Executive Order No. 1976-8 was to become effective September 1, 1976; the effective date was extended by Executive Order No. 1976-8a to November 1, 1976.

[2] "[Letterhead of the Governor of the State of Michigan]

"October 6, 1976

"Mr. Thomas L. Munson
2700 City National Bank Building
Detroit, Michigan 48226

"Dear Mr. Munson:

"Thank you for your letter expressing concern over Executive Order 1976-8 and 1976-8a which allow the reorganization of the Department of Natural Resources.

"The net result of this reorganization will be to shift the administration of certain functions from the Air Pollution Control Commission and the Water Resources Commission to the Natural Resources Commission. *The Air and Water Commissions will retain the essential adjudicative and rule making functions.* These commissions will, by rule, promulgate standards; and issue, revoke, and modify permits and orders to implement such standards while the investigative and prosecutorial functions are shifted to the Department of Natural Resources. Thus, the professional staff of the Department of Natural Resources, subject to supervision of the Director and Natural Resources Commission, will investigate the facts and institute proceedings in which the Air and Water Commissions will make any necessary administrative adjudications.

"By separating the functions of the administrative prosecutor and administrative judge, I believe we have improved the system of checks and balances which you referred to in your letter.

"With respect to your concern that all interested parties should be given time to comment on the proposed order; prior to receiving my

ment,[3] both of which were issued contemporaneously with the executive order, some eight months

signature, the order was reviewed by the interested commissions, department directors, and the Office of the Attorney General. Their comments and concerns were given full consideration. In addition, the Legislature has been given four.months, twice the amount of time required under the Constitution, to review the order. I believe that the opportunity for review has been adequate and fair.

"Kind personal regards.

"Sincerely,
/s/ *William G. Milliken* ·
Governor"

(Emphasis supplied.)

[3] "GOVERNOR'S ORDER REORGANIZING DEPARTMENT TAKES EFFECT MICHIGAN DEPARTMENT OF NATURAL RESOURCES NEWS BULLETIN

"Lansing—Governor William G. Milliken's executive order which officially reorganizes the Department of Natural Resources under a centralization plan recommended last December by Director Howard A. Tanner takes effect November 1.

"The order (1976-8) repeals Executive Order 1973-2a and amends Executive Order 1973-2, under which the· Water Resources Commission and Air Pollution Control Commission were transferred to the department.

"*The order transfers the enforcement functions of the commissions to the department central staff. However, the commissions retain their responsibilities for setting standards, issuing orders and adopting rules as required under their legislative mandates, Governor Milliken states.*

"It also authorizes Tanner to appoint executive secretaries to the commissions—with the advice and consent of the commission members.

"The order officially eliminates the DNR's two-branch organizational structure—with separate branches for natural resources management and environmental protection functions. It permits uniting those responsibilities into a more centralized organization designed for efficiency.

"The Governor says the order permits the placing of the DNR's divisions with environmental protection mandates—air and water quality and resource recovery—under one roof: the Bureau of Environmental Protection.

"The order also permits the DNR to focus additional attention on the problems of land use and water management; included among the new divisions in the restructured department is a DNR Bureau of Land and Water Management.

" 'I am pleased that Director Tanner has taken special note of the rising importance of land use in his restructuring of the department,' remarks Milliken. 'This is an important step toward coordinating functions previously scattered among many elements of the DNR.'

"The reorganization of the department also will help implement

before the challenged regulation was promulgated, suggest that it was.

If the Governor desired that the DNR exercise rule-making power under the cleaning agent act, all that needed to be done to make that clear was to amend the executive order to so specifically provide. Absent such specific statement, it would seem that the Governor's letter of October 6, 1976, stating that the Water Resources Commission "will retain the essential adjudicative and rule-making functions",[4] should apply to the cleaning agent act, as well as to the general enabling act, act 245.

It is clear that the Governor did not confer on the DNR the Water Resources Commission's rule-making powers under the general enabling act, act 245. No reason appears why the Governor would want to retain in the Water Resources Commission rule-making authority under the general enabling act and confer on the DNR the Water Resources Commission's rule-making authority under other acts not specifically referred to in the executive order.

The argument that this was a Type II transfer and that, by the terms of the statute providing therefor (MCL 16.103[b]; MSA 3.29[3][b]), all statutory authority, powers, and duties were transferred, ignores the fact that all authority, powers, and duties were not transferred.

We would reverse.

COLEMAN, J., concurred with LEVIN, J.

RILEY, J., took no part in the decision of this case.

---

Milliken's directive to the department that it do all it can to eliminate administrative delays in the permit-issuing process." (Emphasis supplied.)

[4] See fn 2.